AMY JANE LONGO, Cal. Bar No. 198304
E-mail:  LongoA@sec.gov
ROBERTO A. TERCERO, Cal. Bar No. 143760
E-mail:  TerceroR@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
John W. Berry, Associate Regional Director
444 South Flower Street, Suite 900
Los Angeles, California 90071-9591
Telephone:  (323) 965-3998
Facsimile:  (213) 443-1905

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>IMRAN HUSAIN and GREGG EVAN JACLIN,<br><br>　　　　　Defendants. | Case No.  **2:16-cv-03250-ODW-E**<br><br>**FIRST AMENDED COMPLAINT** |

Plaintiff Securities and Exchange Commission (the "SEC") alleges as follows:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) and 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e), and 78aa.

2.     Defendants Imran Husain ("Husain") and Gregg Evan Jaclin ("Jaclin") have, directly or indirectly, made use of the means or instrumentalities

of interstate commerce or of the mails, in connection with the transactions, acts, practices and courses of business alleged in this Complaint.

3.      Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district. In addition, venue is proper in this district because Husain resides in this district.

## SUMMARY

4.      This action concerns defendants' Husain's and Jaclin's fraudulent "shell factory" enterprise—a scheme they operated, acting in concert, to:  (1) create public "shell" companies, which had virtually no assets or operations and had no legitimate business purpose, and (2) sell them to buyers who sought to trade the shell companies' stock publicly.  As the defendants were aware, these shell companies were valuable because they allowed the people who acquired them to completely control the shares and corporate actions of the companies that otherwise appeared to be legitimate public companies.

5.      The scheme was carried out by Husain, an undisclosed control person and promoter based in Los Angeles, and Jaclin, a corporate attorney who made his living representing companies like the ones created and sold in the shell factory.  In his plea agreement in *U.S. v. Husain*, No. CR 14-149 RS (N.D. Cal.), which was unsealed after the SEC filed the initial complaint in this action, Husain admits how he and Jaclin carried out their shell factory enterprise.

6.      From 2006 to 2013, Husain and Jaclin together created nine shell companies, seven of whose stock was subsequently sold for hundreds of thousands of dollars in sales proceeds and attorney fees as a result of the fraudulent scheme.

7.      The shell factory scheme followed a routine pattern, which Jaclin devised and taught to Husain.  First, Husain created a written "business plan" for a new company to be created and convinced a friend, friend of a friend, relative or

acquaintance of his to be the CEO but in name only.  Husain would actually control the company and the CEO's activities, so the CEO was no more than Husain's "puppet."  Husain then instructed the puppet CEO to engage Jaclin's law firm to incorporate the company, prepare the documents for a private offering of the company's shares of stock, take the company public, and obtain clearance for the company's stock to trade publicly.

8.     After the company was incorporated, Husain then orchestrated a sham private placement offering of the company's shares to approximately 35 purchasers (the "Straw Shareholders").  Jaclin prepared the documents for the offering, including a subscription agreement, which documented the Straw Shareholder's purchase of shares, and an investor questionnaire, to give the appearance that the investor was bona fide.  These Straw Shareholders, however, either did not exist, or they used cash supplied by Husain to "buy" the shares.  Although this made it appear as if the company was owned by third parties, Husain maintained control of the company, and he and Jaclin maintained possession of the company's shares.

9.     Once the company was established and its shares had been "sold" to the Straw Shareholders, Husain took the company public by having it file a registration statement (on Form S-1) with the SEC to register the shares purportedly held by the Straw Shareholders.  Jaclin and his law firm, as company counsel, drafted and prepared the registration statement at Husain's direction.  Husain reviewed and approved drafts of the registration statements.  The registration statements contained materially false and misleading statements concerning the company's management, business plan, and Straw Shareholders.

10.     After the registration statement became effective, Jaclin and his law firm, as company counsel, filed periodic reports, such as annual reports on Form 10-K and quarterly reports on Form 10-Q, with the SEC that repeated many of the same false and misleading statements.  Again, Husain directed the preparation of the filings, and reviewed and approved drafts of the periodic reports.

11.     Husain and Jaclin collectively then provided materially false and misleading information to market makers to obtain clearance to enter quotes for the company's shares on the over-the-counter ("OTC") Bulletin Board or the OTC Link so that the company's shares could be purchased or sold on the public securities markets.  Husain also provided materially false and misleading information to transfer agents affiliated with the market maker to obtain approval from the Depository Trust Company ("DTC") to settle trades in the company's stock electronically and thus at a lower cost.  Clearance to enter quotes for public trading and electronic settlement of stock trades made the company more attractive to potential buyers.

12.     Once the shell company was established as a publicly-traded company, Husain and Jaclin, acting in concert, would try and sell it.  Husain sold seven shell companies to purchasers (the "Shell Company Purchasers"); Jaclin introduced Husain to the purchasers who bought six of those shell companies. Ultimately, Husain—under the guise of the Straw Shareholders—sold seven of the shell companies the factory created, reaping $215,000 to $425,000 of sale proceeds for each shell sold.  In total, Husain obtained about $2.25 million in sale proceeds. Jaclin, whose firm provided the legal services for each sale, earned nearly $225,000 for his firm for this work.

13.     For the sales of two of the shells, Jaclin, as company counsel, also filed a post-effective amendment to the registration statement or a Form 10-K shortly in advance of the sale.  Husain directed, reviewed and approved these two filings, which falsely claimed that neither company had any plans or understandings to engage in a merger—even though portions of the sales proceeds had already been received into escrow at Jaclin's firm, Jaclin's firm had begun to prepare merger documents, and the due diligence process by the Shell Company Purchasers had begun.

14.     Husain and Jaclin made concerted efforts to conceal their fraudulent

4

scheme, including: (1) communicating through email accounts Husain set up, at Jaclin's direction, that falsely appeared to be email accounts in the names of the puppet CEOs, rather than email accounts created and used by Husain; (2) using a computer consultant, hired by Husain at Jaclin's direction, to destroy emails between Husain and Jaclin or Jaclin's firm; and (3) collaborating to coach one of the puppet CEOs how to testify falsely in SEC investigative proceedings, to hide Husain's identity and role as the shell company's control person.

15. By this conduct:

(a) Husain and Jaclin each violated the registration provisions of Section 5(a) and 5(c) [15 U.S.C. §§ 77(e)(a), 77(e)(c)] and, alternatively, Husain and Jaclin each aided and abetted the Shell Company Purchasers' violations of these registration provisions, and Jaclin aided and abetted Husain's violations of these registration provisions;

(b) Husain and Jaclin each violated the antifraud provisions of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and, alternatively, Husain and Jaclin each aided and abetted the shell companies' violations of these registration provisions, and Jaclin aided and abetted Husain's violations of these registration provisions;

(c) Husain and Jaclin each violated the antifraud provisions of Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a), (c)] and, alternatively, Husain and Jaclin each aided and abetted the shell companies' violations of these antifraud provisions, Jaclin aided and abetted Husain's violations of these antifraud provisions, and Husain is liable for the shell companies' violations of these antifraud provisions under the control person provisions of Section 20(a) of the Exchange Act [15 U.S.C. §§ 78t(a)];

(d) Husain violated the antifraud provisions of Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R.§

5

240.10b-5(b)] and, alternatively, Husain and Jaclin each aided and abetted the shell companies' violations of these antifraud provisions, Jaclin aided and abetted Husain's violations of these antifraud provisions, and Husain is liable for the shell companies' violations of these antifraud provisions under the control person provisions of Section 20(a) of the Exchange Act [15 U.S.C. §§ 78t(a)]; and

(e)    Husain and Jaclin each aided and abetted the shell companies' violations of the reporting provisions of Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], and Rules 12b-20, 15d-1 and 15d-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.15d-1, 240.15d-13];

16.    The SEC seeks, against both Husain and Jaclin, disgorgement of ill-gotten gains with prejudgment interest, civil penalties, penny stock bars, and, against Husain, an officer and director bar.

## THE DEFENDANTS

17.    **Imran Husain** resides in Santa Monica, California.  Husain is in the business of starting companies, taking them public, and selling them to purchasers seeking to acquire public shell companies, in order to offer and sell their stock to the public.  On March 20, 2014, Husain was charged with conspiracy and obstruction of justice relating to an SEC investigation of one of the companies in the shell factory scheme.  *See U.S. v. Husain*, No. CR 14-149 RS (N.D. Cal.), Dkt. No. 1.  On October 14, 2014, he pled guilty to one count of conspiracy to obstruct the proceedings of the SEC, naming Jaclin as one of two co-conspirators in his publicly-filed plea agreement.  *See id.*, Dkt. No. 24.

18.    **Gregg Evan Jaclin** resides in Princeton Junction, New Jersey, and is admitted to the bar in New York and New Jersey.  Jaclin is a corporate securities attorney whose practice focuses on taking microcap companies public, preparing their periodic SEC reports, and serving as counsel when the shell companies are sold.  During the majority of the relevant time period, Jaclin was a partner at the now-dissolved firm of Anslow & Jaclin, which was in Englishtown, New Jersey.

## THE SHELL COMPANIES

19.     As part of their fraudulent scheme, Husain and Jaclin, acting in concert, created a total of nine shell companies (collectively, the "shell companies"):  (1) New Image Concepts, Inc. ("New Image"); (2) PR Complete Holdings, Inc. ("PR Complete"); (3) Ciglarette Inc. ("Ciglarette"); (4) Rapid Holdings, Inc. ("Rapid Holdings"); (5) Resume in Minutes, Inc. ("Resume in Minutes"); (6) Movie Trailer Galaxy ("Movie Trailer"); (7) Health Directory, Inc. ("Health Directory"); (8) Comp. Services, Inc. ("Comp. Services"); and (9) Counseling International, Inc. ("Counseling International").

20.     **New Image** was incorporated in Nevada on October 23, 2006. Located in Miami Beach, Florida, New Image claimed that it would offer personal style consultation services.

(a)     On March 18, 2008, New Image filed a Form S-1 registration statement, in connection with an initial public offering of 997,855 shares of common stock at an offering price of $0.05 per share, for a total offering amount of $49,893.  The registration statement was filed on March 18, 2008; was amended on April 1, 2008; became effective on April 4, 2008; and was amended post-registration on September 23, 2009, effective September 29, 2009.

(b)     From May 13, 2008 through November 12, 2009, New Image filed periodic reports with the SEC pursuant to Section 15(d) of the Exchange Act and related rules thereunder.

(c)     On December 7, 2009, New Image was sold, through a reverse merger, for $215,000.

(d)     Following the merger, New Image changed its name to Car Charging Group, Inc.  Common stock of Car Charging Group was offered and sold to the public beginning on December 14, 2009, under the symbol "CCGI." Its common stock is currently quoted on OTC Link.

21.     **PR Complete** was incorporated in Nevada on May 22, 2008.

7

Located in San Francisco, California, PR Complete claimed that it planned to be an online press release preparation service.

(a)     On November 7, 2008, PR Complete filed a Form S-1 registration statement in connection with an initial public offering of 914,000 shares of common stock at an offering price of $0.05 per share, for a total offering of $45,700.  The registration statement was filed on November 7, 2008; was amended on December 15, 2008 and January 5, 2009; became effective on January 16, 2009; and was amended post-registration on September 23, 2009, effective September 24, 2009.

(b)     From March 23, 2009 through November 16, 2009, PR Complete filed periodic reports with the SEC pursuant to Section 15(d) of the Exchange Act and related rules thereunder.

(c)     On December 4, 2009, PR Complete was sold, through a reverse merger, for $240,000.

(d)     Following the merger, PR Complete changed its name to YesDTC Holdings.  Common stock of YesDTC Holdings was offered and sold to the public beginning on January 21, 2010, under the symbol "YESD."

(e)     On November 17, 2014, the SEC suspended trading in YESD pursuant to Section 12(k) of the Exchange Act.  *In re YesDTC Holdings, Inc.*, Release No. 34-73611 (Nov. 17, 2014).  On December 15, 2014, each class of its registered securities was revoked pursuant to Section 12(j) of the Exchange Act, which became final on January 27, 2015.  *In re YesDTC Holdings, Inc*., Rel. No. 34-74140 (Jan. 27, 2015).  On February 25, 2015, a final judgment was entered as to YesDTC's CEO Joseph Noel, for a pump and dump scheme involving YesDTC's stock.  *SEC v. Noel*, Case No. 14-cv-05054-VC (N.D. Cal.) (Dkt. No. 27).

22.     **Ciglarette** was incorporated in Nevada on December 23, 2009. Located in New York, New York, Ciglarette claimed that it would become an e-

8

cigarette marketer and distributor.

      (a)    On April 28, 2010, Ciglarette filed a Form S-1 registration statement in connection with an initial public offering of 296,703 shares of common stock, at an offering price of $0.05 per share, for a total of $14,835.  The registration statement was filed on April 28, 2010; was amended on May 18, 2010, June 9, 2010, June 15, 2010, June 22, 2010, and June 24, 2010; and became effective on June 24, 2010.

      (b)    From July 20, 2010 through January 10, 2011, Ciglarette filed periodic reports with the SEC pursuant to Section 15(d) of the Exchange Act and related rules thereunder.

      (c)    On March 1, 2011, Ciglarette was sold, through a reverse merger, for $275,000.

      (d)    Following the merger, Ciglarette changed its name to Kirin International Holding, Inc.  Common stock of Kirin International Holding was offered and sold to the public beginning on March 14, 2011, under the symbol "KIRI."  In December 2015, the company was the subject of a change in control transaction and in January 2016 was renamed Yangtze River Development Limited.  Its common stock is quoted on OTC Link under the symbol "YERR."

    23.    **Rapid Holdings** was incorporated in Nevada on March 22, 2010. Located in Orlando, Florida, Rapid Holdings claimed that it made loans to individuals, secured by the borrowers' automobiles.

      (a)    On July 2, 2010, it filed a Form S-1 registration statement in connection with an initial public offering of 818,000 shares of common stock, at an offering price of $0.05 per share, for a total of $40,900.  The registration statement was filed on July 2, 2010; was amended on August 9, 2010, August 19, 2010, August 27, 2010, September 2, 2010, September 10, 2010, September 23, 2010, October 1, 2010, and October 5, 2010; and became effective on October 8, 2010.

(b)     From August 31, 2010 through May 16, 2011, Rapid Holdings filed periodic reports with the SEC pursuant to Section 15(d) of the Exchange Act and related rules thereunder.

(c)     On May 11, 2011, Rapid Holdings was sold, through a reverse merger, for $367,000.

(d)     Following the merger, Rapid Holdings changed its name to Izea, Inc.  Common stock of Izea was offered and sold to the public beginning on June 7, 2011, under the symbol "IZEA."  Its common stock is currently traded on the Nasdaq Capital Market.

24.     **Resume in Minutes** was incorporated in Nevada on May 22, 2008. Located in Irvine, California, Resume in Minutes claimed that it planned to offer online all-in-one resume-building services.

(a)     On May 11, 2010, Resume in Minutes filed a Form S-1 registration statement in connection with an initial public offering of 267,400 shares of common stock, at an offering price of $0.05 per share, for a total of $13,370.  The registration statement was filed on May 11, 2010; was amended on June 23, 2010, July 15, 2010, July 20, 2010, and July 23, 2010; and became effective on July 27, 2010.

(b)     From August 31, 2010 through May 16, 2011, Resume in Minutes filed periodic reports with the SEC pursuant to Section 15(d) of the Exchange Act and related rules thereunder.

(c)     On June 24, 2011, Resume in Minutes was sold through a reverse merger, for $350,000.

(d)     Following the merger, Resume in Minutes changed its name to MEDL Mobile Holdings, Inc.  In October, the company changed its name once more to With, Inc.  Its common stock is currently quoted on OTC Link under the symbol "WWTH."

25.     **Movie Trailer** was incorporated in Nevada on April 27, 2010.

Located in Mississauga, Ontario, Canada, Movie Trailer claimed to be an online portal to preview the latest movie information.

(a)     On October 15, 2010, Movie Trailer filed a Form S-1 registration statement in connection with an initial public offering of 280,985 shares of common stock, at an offering price of $0.05 per share, for a total of $14,049.  The registration statement was filed on October 15, 2010; was amended on December 16, 2010, January 19, 2011, February 9, 2011, March 2, 2011, and March 18, 2011; became effective March 25, 2011; and was amended post-registration on September 4, 2012, effective September 12, 2012.

(b)     From May, 9, 2011 through November 29, 2011, Movie Trailer filed periodic reports with the SEC pursuant to Section 15(d) of the Exchange Act and related rules thereunder.

(c)     On September 11, 2012, Movie Trailer was sold through a reverse merger, for $370,000.

(d)     Following the merger, it changed its name to Broadcast Live Digital Corp.  Common stock of Broadcast Live Digital Corp. was offered and sold to the public beginning on October 23, 2012 under the symbol "BFLD."  Its common stock was quoted on OTC Link.  On March 7, 2014, the SEC suspended trading in the securities of Broadcast Live Digital Corp., citing questions regarding the accuracy of publicly available information concerning its business operations. *In re Broadcast Live Digital Corp.,* Rel. No. 34-71659 (Mar. 7, 2014).

26.   **Health Directory** was incorporated in Nevada on September 29, 2010.  Located in San Jose, California, Health Directory claimed to be an online health-related directory website.

(a)     On May 27, 2011, Health Directory filed a Form S-1 registration statement in connection with an initial public offering of 759,400 shares of common stock, at an offering price of $0.05 per share, for a total of $37,970.  The registration statement was filed May 27, 2011; was amended July

11

14, 2011, August 12, 2011, September 21, 2011, and October 4, 2011; and became effective on October 19, 2011.

(b)     From November 19, 2011 through June 28, 2012, Health Directory filed periodic reports with the SEC pursuant to Section 15(d) of the Exchange Act and related rules thereunder.

(c)     On July 20, 2012, Health Directory was sold through a reverse merger, for $425,000.

(d)     Following the merger, Health Directory changed its name to Sollensys Corp.  Common stock of Sollensys Corp. was offered and sold to the public beginning on October 15, 2012, under the symbol "SOLS."  Its common stock is currently quoted on OTC Link.

27.     **Comp Services** was incorporated in Nevada on June 17, 2011. Located in Turlock, California, Comp Services claimed to be an online computer parts and services provider.

(a)     On December 20, 2011, Comp Services filed a Form S-1 registration statement in connection with an initial public offering of 739,000 shares of common stock, at an offering price of $0.05 per share, for a total of $36,950.  The registration statement was filed December 20, 2011; was amended January 27, 2010, February 22, 2012, March 14, 2012, April 10, 2012, April 23, 2012, April 26, 2012, and April 30, 2012; became effective on May 4, 2012; and was amended post registration on October 17, 2013, November 27, 2013, and December 18, 2013.

(b)     From June 14, 2012 through September 23, 2013, Comp Services filed periodic reports with the SEC pursuant to Section 15(d) of the Exchange Act and related rules thereunder.

(c)     Its common stock was quoted on the OTC Link under the symbol "CMPS." On April 23, 2014, while a post-effective amendment was pending, the SEC issued a stop order suspending the effectiveness of its

12

registration statement, citing the company's failure to disclose its control person/promoter. *In re the Registration Statement of Comp Services, Inc.,* Rel. No. 33-9577 (Apr. 23, 2014).

28. **Counseling International** was incorporated in Nevada on September 30, 2011. Located in Los Angeles, California, Counseling International purportedly engaged in the business of providing online access to providers of low-cost counseling services and mental health-related products.

(a) On August 8, 2012, Counseling International filed a Form S-1 registration statement in connection with an initial public offering of 763,400 shares of common stock, at an offering price of $0.05 per share, for a total offering amount of $38,170. The registration statement was filed August 8, 2012; and was amended September 25, 2012, November 19, 2012, December 19, 2012, and January 9, 2013.

(b) On August 22, 2013, the SEC issued a stop order suspending the effectiveness of Counseling International's registration statement, citing the company's failure to disclose its control person/promoter. *In re the Registration Statement of Counseling International,* Rel. No. 33-9444 (Aug. 22, 2013).

## THE FRAUDULENT AND ILLEGAL SCHEME

### A. Jaclin's "Self-Filing Model"

29. In or about 2004, Jaclin met Husain, who sought advice about how to take a company public. Jaclin introduced Husain to what Jaclin termed his "self-filing model."

30. Under Jaclin's self-filing model, a company is first incorporated and conducts a private placement offering of its stock to a limited number of investors, such as friends and family.

31. Next, the company files a Form S-1 registration statement with the SEC to register a public offering of the private placement investors' stock.

32. Once the registration statement becomes effective, the company files

13

periodic reports on Forms 10-K and 10-Q in accordance with SEC regulations.

33.     The company then works with a market maker to obtain clearance from the Financial Industry Regulatory Authority ("FINRA") to publish stock price quotations on the OTC Bulletin Board or OTC Link, thereby enabling the stock to be purchased or sold in the public securities market.  Exchange Act Rule 15c2-11, 17 C.F.R. § 240.15c2-11, requires a broker or dealer to obtain reasonably current information concerning a company before publishing a quotation for the company's securities, often including the registration statement filed with the SEC.

34.     Once FINRA provides quotation clearance, the company works with the market maker and a transfer agent to obtain DTC eligibility so that trades of its stock can be settled electronically and thereby reduce costs and time when a share of stock is traded.

35.     At the outset of the scheme, Jaclin advised Husain to create small companies that Husain could control from start to finish, including control of both the private placement investors and the companies' management.

36.     Jaclin and Husain agreed that Husain should be considered as only a "consultant" to the shell companies, even though Husain created and exercised control over the companies.

37.     Jaclin advised Husain to keep his name off of the corporate documents, including SEC filings made by the shell companies.

38.     Jaclin advised Husain that the SEC would be unlikely to approve the registration statements if Husain's name was disclosed as an officer, control person, or primary shareholder on numerous shell companies.

39.     Husain understood that it would look suspicious to the SEC if he was listed as a control person for numerous shell companies.

**B.     The Shell Factory Scheme and the False Statements**

40.     Utilizing Jaclin's self-filing model, Husain and Jaclin, acting

14

together, created the nine public shell companies, using the following series of recurring steps.

### 1. Incorporating the Shell Companies and Hiring Puppet CEOs

41.     Jaclin directed Husain to locate "nominees" to serve as the CEOs of the shell companies.

42.     Husain recruited the potential puppet CEO, such as a friend, friend of a friend, relative, or administrative assistant, to serve as a CEO in name only.

43.     Husain directed the puppet CEO to form a shell company, explaining that Husain himself would handle all of the corporate, legal, and regulatory matters necessary to take the company public.

44.     Husain typically selected a business plan for the shell company that related to the puppet CEO's own background.

45.     Jaclin advised Husain that the puppet CEOs should receive some salary to avoid raising suspicions.

46.     Husain promised potential puppet CEOs a salary of between $500 and $700 per month.

47.     Husain introduced the puppet CEO to Jaclin, who sent the puppet CEO, directly or through Husain, an engagement letter for him and his firm to serve as the shell company's counsel.  The engagement letters typically explained that Jaclin and his firm would provide legal services to incorporate the company, conduct a private placement offering of the company's stock, file a registration statement to take the company public, and help obtain quotation clearance by working with a market maker to file an application with FINRA on Form 211.

48.     Jaclin and his firm incorporated the shell company.

49.     Husain controlled the actions taken by the puppet CEOs.

50.     Husain, rather than the puppet CEOs, communicated with Jaclin and his firm concerning decisions involving the companies.

51.     The puppet CEOs did not exercise any actual control over the

companies, though their names appeared on the corporate documents prepared by Jaclin's firm as company counsel.

52.     Husain and Jaclin knew, or were reckless or negligent in not knowing, that Husain had final authority on all matters involving the shell companies, even though Husain's name did not appear on any of the corporate documents prepared by Jaclin's firm.

**2.     The Sham Private Offerings**

53.     After incorporating the shell company, Husain organized a private offering of the shell company's stock to approximately 35 individuals who were shareholders in name only (the "Straw Shareholders").

54.     Jaclin's firm, as company counsel, prepared a private placement memorandum, based on a fake business plan provided by Husain.  Jaclin's firm also prepared the subscription agreement, which would document the purported sale of stock by the shell company to the Straw Shareholder, and an investor questionnaire to make it appear that the Straw Shareholder was a bona fide stock purchaser.

55.     The private offerings were shams because Husain gave the Straw Shareholders cash to buy the stock, and, in some instances used the names and social security numbers of deceased individuals as the purported investors.

56.     Husain enlisted several acquaintances to recruit Straw Shareholders, paying the recruiters commissions of between $200 to $400 for each investor they obtained.

57.     The Straw Shareholders used Husain's cash either to write a personal check or to obtain a cashier's check payable to the shell company.  Some Straw Shareholders paid with money orders from retail outlets such as CVS or Seven-Eleven.  In some instances, Husain's recruiters obtained a cashier's check or money order for the Straw Shareholder, using the cash that Husain provided.

58.     Jaclin advised Husain that the Straw Shareholders should submit

personal or cashier's checks, rather than money orders, to avoid raising regulators' suspicions.

59.    The Straw Shareholder signed the documents that Husain gave the recruiter, namely a subscription agreement, investor questionnaire, and a blank stock power.

60.    When Husain subsequently sold the shell company, he filled in the stock power to make it appear to the transfer agent that the Straw Shareholder was selling his or her stock.

61.    Jaclin and Husain maintained possession of the stock certificates issued to the Straw Shareholders in the sham private offerings.

62.    When the Straw Shareholders purportedly purchased shares in the shell companies, the shell companies were controlled by Husain, and no restrictive legend appeared on the stock certificates for the shares sold to the Straw Shareholders.

63.    The fact that the companies' shares were purportedly sold to and held by the Straw Shareholders gave the appearance that third parties actually owned the companies, when, in fact, Husain retained ownership and control over them.

64.    Husain and Jaclin knew, or were reckless or negligent in not knowing, that the private offerings were shams, that the Straw Shareholders, to the extent they were real people, were using Husain's money to purchase the shares, and that Husain owned and controlled the shares.

**3.    The False and Misleading S-1 Registration Statements**

65.    Husain and Jaclin, acting in concert, then took each shell company public through a Form S-1 registration statement filed with the SEC and amendments thereto, offering the shares from the sham private placement.

66.    Husain and Jaclin, acting in concert, caused the registration statements and amendments listed in Appendix 1 hereto (each a "Registration Statement") to be filed on behalf of the nine shell companies.

17

67.     For each shell company public offering, and the registration of the offering, Jaclin and his firm served as counsel for the shell company.

68.     For each Registration Statement for each shell company, Husain controlled the efforts to prepare, review, file, and obtain a notice from the SEC declaring it effective, including providing to Jaclin's firm and to the shell company's auditor, information, documents, and puppet CEO signatures, as needed.  Either Husain or Jaclin provided the auditor with the subscription agreements, investor questionnaires, and investor checks and money orders to make it appear as if the shell company was owned by the investors whose shares were the subject of the Registration Statement.

69.     Husain reviewed and approved documents and served as the main point of contact for the shell companies with Jaclin's law firm and the auditor throughout the registration process.

70.     Jaclin instructed his associates that Husain had the authority to approve documents for filing with the SEC.

71.     Jaclin's associates emailed each draft Registration Statement, including any changes or edits, to Jaclin for his approval.

72.     The draft Registration Statement was then sent to Husain and the shell company's outside auditor for review, before being filed with the SEC.

73.     Jaclin permitted his associates to use his electronic signature for his firm's opinion letters that were attached to the registration statements, which stated that the shares in the offering had been duly authorized, legally issued, fully paid and were non-assessable.

74.     Each of the shell companies' Registration Statements contained numerous materially false and misleading statements.

(a)     Each Registration Statement falsely claimed that the puppet CEO was the officer, director, and employee of the shell company, and often the sole one of each.  These statements were false and misleading because there was

18

no mention of Husain's identity and role as the control person and promoter of the shell company, or that the puppet CEO was the CEO in name only.  Husain was a "control person" because, as alleged above, he directly or indirectly, possessed the power to direct or cause the direction of the management and policies of each shell company.  He was a "promoter" because he, in conjunction with Jaclin and others, directly or indirectly took the initiative in founding and organizing the business or enterprise of the shell companies.

(b)     Each Registration Statement misrepresented the shell company's business purpose by stating that the company would operate in accordance with its business plan.  These statements were false and misleading because the actual operations of the shell companies consisted only of turning the shell company into a public shell that would then be sold.

(c)     Each Registration Statement misrepresented that the Straw Shareholders:  (1) purchased their shares in a private offering; (2) were selling the shares for their own account in the registered offering; and (3) were not affiliated with any of the shell company's officers, directors, promoters, or any beneficial owner of 10% or more of the shell company's securities.  These statements were false and misleading because:  (1) some of the Straw Shareholders did not exist, much less purchase or hold shares; (2) the majority of the remaining Straw Shareholders paid for the shares with cash that Husain supplied through the recruiters; (3) Husain and Jaclin held the shares rather than the Straw Shareholders; (4) the shares under the offering were for Husain's account, not the Straw Shareholders' accounts; and (5) each Straw Shareholder was affiliated with Husain, who was the shell company's control person and promoter and controlled its securities.

75.     Husain and Jaclin knew, or were reckless or negligent in not knowing, that representations alleged above in the Registration Statements were false and misleading.  In addition, neither exercised reasonable care to ensure that

19

the Registration Statements were not false or misleading.

76.     Husain and Jaclin knowingly or recklessly provided substantial assistance to the shell companies in issuing these false and misleading Registration Statements.

### 4.     The False and Misleading Information Provided to Transfer Agents and Market Makers

77.     Husain selected the transfer agent for each shell company and supplied the transfer agent with shareholder information, serving as the main point of contact.  Husain however disclosed neither his role nor the investors' status as Straw Shareholders.

78.     Once a shell company's Form S-1 registration statement was declared effective, Jaclin sent the transfer agent his firm's Form S-1 opinion letter.

79.     Husain and Jaclin then worked together with a market maker to file a FINRA Form 211 application in order for the market maker to publish quotes for the shell company's stock and enable public trading in its stock.

80.     As part of preparing the Form 211, the market maker reviewed the shell company's registration statement, which was incorporated into the Form 211, including the materially false and misleading statements.

81.      Also as part of the Form 211 process, Husain completed an information statement and officer and director questionnaire for each shell company.  These documents repeated the false and misleading statements from the shell company's registration statement concerning Husain's identity and role, and the companies' business plans.

82.     Husain had the puppet CEO for each shell company sign the information statement and questionnaire, or forged his or her signature.

83.     Jaclin and his firm, as company counsel, provided information and documents to the market maker, such as copies of the subscription agreements and investor checks from the private placement.  Jaclin also helped respond to

comments from FINRA about the shell companies' applications.

84.     Once FINRA provided clearance, the market makers entered quotes for each shell company's stock on one of the over-the-counter quotation systems.

85.     Husain then worked with the market maker and its affiliated transfer agent to obtain DTC eligibility for each shell company's stock, which allows for electronic settlement of the stock and therefore at a lower cost, thereby enhancing the value of the shell company for sale.

86.     Trades on the open market in the stock of New Image, Health Directory and Move Trailer occurred after each company obtained quotation clearance by FINRA and DTC eligibility.

87.     Husain and Jaclin knew, or were reckless or negligent in not knowing, that the information and documents given to the market makers and transfer agents in order to facilitate the commencement of trading repeated the false and misleading information contained in the registration statements.  In addition, neither exercised reasonable care to ensure that these documents were not false or misleading.

88.     Husain and Jaclin knowingly or recklessly provided substantial assistance to shell companies in providing this false and misleading information to the market makers and transfer agents to facilitate the commencement of public trading.

**5.      The False and Misleading Periodic Reports**

89.     Each of the shell companies except for Counseling International (specifically, New Image, PR Complete, Ciglarette, Rapid Holdings, Resume in Minutes, Health Directory, Movie Trailer, and Comp Services) became public companies when their Form S-1 Registration Statements went effective, requiring them to file periodic reports with the SEC.

90.     In order to maintain these companies' reporting status, Jaclin and his firm, as company counsel, filed periodic reports with the SEC on Forms 10-K and

10-Q listed in <u>Appendix 2</u> (each a "Periodic Report").

91.     Jaclin's associates emailed drafts of Periodic Reports to Jaclin for his approval.

92.     Husain directed the preparation of the companies' Periodic Reports and reviewed and approved drafts of the Periodic Reports.  Jaclin's associates also emailed the draft Periodic Reports to Husain, once they were ready for review by the company and the outside auditor.

93.     Each of the Periodic Reports repeated the following false and misleading information contained in the registration statements:

(a)     Each Periodic Report falsely claimed that the puppet CEO was the officer, director, and employee of the shell company, and often the sole one of each.  These statements were false and misleading because there was no mention of Husain's identity and role as control person and promoter or the puppet CEO's *de minimis* role; and

(b)     Each misrepresented the company's business purpose by stating that the company would operate in accordance with its business plan, whereas the actual plans and operations consisted of turning the company into a public shell that subsequently would be sold.

94.     Husain and Jaclin knew, or were reckless or negligent in not knowing, that representations alleged above in the Periodic Reports were false and misleading.  In addition, neither exercised reasonable care to ensure that the Periodic Reports were not false or misleading.

95.     Husain and Jaclin knowingly or recklessly provided substantial assistance to the shell companies in issuing these false and misleading Periodic Reports.

**6.     The Sale of Seven Shell Companies and More Misrepresentations**

**a.     The Sales**

96.     Approximately one-and-a-half to two years after incorporation,

Husain sold seven of the shell companies (*i.e.*, New Image, PR Complete, Ciglarette, Rapid Holdings, Resume in Minutes, Health Directory, and Movie Trailer, but not Comp Services or Counseling International).

97.   These seven shell companies were sold for sales proceeds ranging from $215,000 to $425,000, totaling $2.25 million.  The sale prices and dates for the sales of these seven shell companies are listed in Appendix 3.

98.   Jaclin's firm provided the legal services to the shell company for each sale and received attorneys' fees for each sale.

99.   Jaclin introduced Husain to the purchasers for New Image, Ciglarette, PR Complete, Rapid Holdings, Resume in Minutes, and Movie Trailer.

100.   For each shell company sale, Jaclin advised Husain to appoint a shareholder representative to effect the sale, including the transfer of the Straw Shareholders' stock to the purchaser(s).

101.   Husain appointed a shareholder nominee as a representative for the Straw Shareholders for each shell company sale.

102.   For each sale, Jaclin's firm, as company counsel, prepared stock purchase agreements among the Shell Company Purchaser(s), the shell company, the puppet CEO, and each Straw Shareholder (on whose behalf the nominee-representative signed the agreement).

103.   Also as part of each sale, Jaclin's firm prepared an escrow agreement among the nominee-representative, the Shell Company Purchaser(s), and an escrow agent.

104.   For six of the sales, Jaclin's firm additionally served as the escrow agent to effect the transfer of the stock certificates and the funds for the shell company purchase.

105.   Once the escrow agent received all of the funds for the sale, the signed agreements, the stock certificates, and the stock powers, the escrow agent wired the sales proceeds to the nominee-representative's bank account, less any

amounts owed for Jaclin's firm's legal fees.

106.   Husain directed the nominee-representative to wire transfer portions of the sales proceeds to one or more of Husain's bank accounts in the United States.

107.   As a further part of each shell company sale, Jaclin's firm provided opinion letters instructing the transfer agent to cancel the shares in the name of the Straw Shareholders and to reissue them in the names of the Shell Company Purchasers.

108.   The sales were accomplished through "reverse merger" transactions with private purchasing entities, where the shareholders of the purchaser acquired a majority of the shares of the public shell company (*i.e.*, the Straw Shareholders' shares), and then the public shell company was merged into the purchasing entity.

109.   For Movie Trailer and Health Directory, the nominee-representative held the shares in the nominee's brokerage account.  As part of the sales of these two companies, Husain instructed the nominee-representative to sell Husain's shares in the open market, where the Shell Company Purchasers bought them.

110.   After the sale of each shell company, the shell company's puppet CEO resigned and new management was installed.

111.   New management changed the shell company's name and business model, as announced in Form 8-K reports publicly filed with the SEC.

### b.   Additional Misleading SEC Filings

112.   In connection with the sales of Health Directory and Movie Trailer, Husain and Jaclin filed documents with the SEC that made false and misleading statements about the companies.

### i.   The Health Directory Form 10-K

113.   Health Directory was sold to a purchaser on July 20, 2012 for $425,000.

114.   Several weeks prior to the sale, on June 28, 2012, Jaclin's firm, as

company counsel, filed Health Directory's Form 10-K report with the SEC.

115.   Husain been reviewed and approved the content of this Form 10-K.

116.   At the time of the Form 10-K filing, Husain had agreed in principle to sell Health Directory, the two parties had begun to prepare merger documents, and the Shell Company Purchaser of Health Directory had paid $25,000 of the $425,000 purchase price to the escrow account at Jaclin's firm.

117.   In addition to the false and misleading statements from its earlier SEC filings, the Health Directory Form 10-K falsely stated that the company had no plans, arrangement, or understanding to engage in a merger.

118.   Husain and Jaclin knew or were reckless or negligent in not knowing, that Health Directory's Form 10-K was false and misleading.  In addition, neither exercised reasonable care to ensure that the Form 10-K was not false or misleading.

### ii.    The Movie Trailer Post Effective S-1 Amendment

119.   As set forth above, Movie Trailer was sold to a purchaser on September 11, 2012 for $370,000.

120.   One week before the sale, on September 4, 2012, Jaclin's firm, as company counsel, filed Movie Trailer's post-effective amendment to its Form S-1 registration statement, which had been reviewed and approved by Husain.

121.   At the time the Form S-1 amendment was filed, the Shell Company Purchaser had already sent Husain and Jaclin a closing checklist, requested documents to review, and deposited $187,500 of the $375,000 purchase price to the escrow account at Jaclin's firm.

122.   In addition to the false and misleading statements from its earlier SEC filings, the Movie Trailer post-effective Form S-1 amendment falsely stated that the company had no plans, arrangement, or understanding to engage in a merger.

123.   Husain and Jaclin knew, or were reckless or negligent in not

knowing, that Movie Trailer's post-effective Form S-1 amendment was false and misleading.

### 7.    Sales by Six Shell Company Purchasers to the Public

124.   The purchasers of the seven shell companies began to offer and sell six of those companies' stock to the public within 90 days of the reverse mergers.

125.   The six shell companies, whose stock was publicly sold shortly after the companies were purchased by the Shell Company Purchasers were New Image, PR Complete, Ciglarette, Rapid Holdings, Health Directory and Movie Trailer (*i.e.*, all but Resume in Minutes).  Appendix 4 lists each of these six shell companies, the name of these companies after their reverse merger sales, the date of those mergers, and the first dates their shares were publicly offered after the mergers.

### C.    The Unregistered Offers and Sales of Shell Companies' Shares

126.   Neither Husain's sales to the Shell Company Purchasers, nor the offer and sale of the shell companies' stock to the public after the reverse mergers, were registered with the SEC, and no exemption from registration applied.

### 1.    Sales by Husain to the Shell Company Purchasers

127.   The offers and sales by Husain of the shares of the seven shell companies listed in Appendix 3 (*i.e.*, New Image, PR Complete, Ciglarette, Rapid Holdings, Resume in Minutes, Health Directory and Movie Trailer) to the Shell Company Purchasers were never registered with the SEC.

128.   The Registration Statements for those seven shell companies registered the offer and sale of the shares supposedly belonging to the Straw Shareholders.  The actual shares in those companies did not belong to the Straw Shareholders but to Husain.

129.   In each shell company's sale, Husain was the issuer of the shell company's shares, because he had complete control over the shell companies at the time they were sold to the Shell Company Purchasers.

130.   In each shell company's sale, the Shell Company Purchasers also acted as underwriters, because they obtained the shares from Husain, the issuer, with a view to distributing the shares to the public.

131.   The Registration Statements did not register the offer or sale of shares by Husain to the Shell Company Purchasers.  In fact, there was no registration statement filed to permit any offer or sale of Husain's shares.  Also, the offer and sale of those shares were not subject to any exemption from registration because, for example, the shares were sold by an issuer (Husain) to underwriters (the Shell Company Purchasers).

132.   The Shell Company Purchasers began offering and selling the companies' securities to the public in open market, over-the-counter transactions, within days or months of each of the reverse mergers for these six companies.

133.   Husain was a necessary participant and a substantial factor in the offer and sale of the shares to the Shell Company Purchasers because he: founded the shell factory; created and secretly controlled the shell companies; registered the Straw Shareholders' purported offering of the shell companies' shares with the SEC; directed, reviewed and approved the companies' SEC filings; worked with the market makers and transfer agents to obtain quotation clearance and DTC eligibility; agreed to sell the shares he controlled to the Shell Company Purchasers; reviewed and approved the September 4, 2012 Movie Trailer post-effective amendment to the S-1 as part of the sale; and appointed shareholder representatives to help consummate the sale to the Shell Company Purchasers. But for Husain's acts, the unregistered sales to the Shell Company Purchasers would not have occurred.

134.   Jaclin was a necessary participant and a substantial factor in the offer and sale of these shares to the Shell Company Purchasers because he:  advised Husain how to create the shell companies; provided legal services to the shell companies from their inception through the reverse mergers; concealed Husain's

identity and role as the control person and promoter for the shell companies while registering the companies with the SEC; worked with the market makers and transfer agents to obtain quotation clearance and DTC eligibility; found the purchasers for six of the seven shell companies; had his law firm prepare stock purchase and escrow agreements; served as escrow agent for to receive and send the signed agreements, stock certificates, stock powers, and sales proceeds for all but one sale; and provided opinion letters instructing the transfer agent to cancel the shares in the names of the Straw Shareholders and reissue them in the names of the Shell Company Purchasers, thereby further facilitating their resale into the public market.  But for Jaclin's acts, the unregistered sales to the Shell Company Purchasers would not have occurred.

135.   Husain and Jaclin knew, or were reckless in not knowing, that they substantially assisted these unregistered offerings to the Shell Company Purchasers.

## 2.     Sales by the Shell Company Purchasers to the Public

136.   The offers and sales by the Shell Company Purchasers of the shares of the six shell companies listed in Appendix 4 (*i.e.*, New Image, PR Complete, Ciglarette, Rapid Holdings, Health Directory and Movie Trailer) to the public were never registered with the SEC.

137.   There were no registration statements filed for the offer and sale of shares by the Shell Company Purchasers to the public. Also, the public offer and sale of those shares were not subject to any exemption from registration because, for example, the shares were sold by the Shell Company Purchasers who were acting as underwriters who had obtained the shares from Husain with a view to distributing them to the public.

138.   Husain was a necessary participant and a substantial factor in the offer and sale by the Shell Company Purchasers to the public because he:  founded the shell factory; created and secretly controlled the shell companies; registered

the shell companies with the SEC; directed, reviewed and approved the companies' SEC filings; worked with the market makers and transfer agents to obtain quotation clearance and DTC eligibility; and agreed to sell the shares he controlled to the Shell Company Purchasers.  But for Husain's acts, the unregistered sales to the Shell Company Purchasers would not have occurred.

139.   Jaclin was a necessary participant and a substantial factor in the offer and sale of these shares by the Shell Company Purchasers to the public because he:  advised Husain how to create the shell companies; provided legal services to the shell companies from their inception through the reverse mergers; concealed Husain's identity and role as the control person and promoter for the shell companies while registering the companies with the SEC; worked with the market makers and transfer agents to obtain quotation clearance and DTC eligibility; found the purchasers for six of the seven shell companies; had his law firm prepare stock purchase and escrow agreements; served as escrow agent for to receive and send the signed agreements, stock certificates, stock powers, and sales proceeds for all but one sale; and provided opinion letters instructing the transfer agent to cancel the shares in the names of the Straw Shareholders and reissue them in the names of the Shell Company Purchasers thereby further facilitating their resale into the public market.  But for Jaclin's acts, the unregistered sales to the Shell Company Purchasers would not have occurred.

140.   Husain and Jaclin knew, or were reckless in not knowing, that they substantially assisted these unregistered offerings by the Shell Company Purchasers to the public.

**D.     Attempts to Obstruct Regulatory Oversight**

141.   Acting in concert, Husain and Jaclin attempted to obstruct regulatory oversight of their shell factory scheme.

**1.     False Appearance and Intentional Destruction of Emails**

142.   Initially, Jaclin and his firm communicated with Husain using

29

Husain's email address.

143.   In or about 2011, Jaclin advised Husain that, to avoid regulatory scrutiny, they should exchange fewer emails.

144.   Jaclin suggested that Husain create and use email accounts in the names of the puppet CEOs to communicate with Jaclin and his firm.

145.   Husain then created email accounts in the names of the puppet CEOs of Health Directory, Movie Trailer, Comp Services, and Counseling International, and used these email addresses to communicate with Jaclin and his firm.

146.   In 2012, Jaclin asked Husain, and Husain agreed, to hire a computer consultant to "scrub" emails amongst Husain, Jaclin and Jaclin's firm.

147.   The consultant then scrubbed Jaclin's and at least two of his associates' emails, resulting in the permanent deletion of their email correspondence with Husain.

### 2.   Obstruction of the SEC's Investigation of PR Complete

148.   In August 2012, the puppet CEO of PR Complete told Husain that she had been subpoenaed by the SEC, in investigative proceedings regarding PR Complete/YesDTC.

149.   Husain contacted Jaclin regarding the subpoena to the puppet CEO.

150.   Jaclin referred Husain to an attorney, whom Husain arranged to have represent the puppet CEO for purposes of her testimony.

151.   In August and September 2012, by telephone and in person, Husain coached the puppet CEO on how to testify, and instructed her to testify falsely by leaving Husain's name out of her testimony.

152.   Because he did not want the SEC to know about his involvement with PR Complete, Husain told the puppet CEO to withhold facts about his role.

153.   Prior to the puppet CEO's testimony, Jaclin suggested to Husain that her testimony should be consistent with what was falsely disclosed in the registration statements Jaclin's firm had filed on behalf of PR Complete.

154.   Jaclin gave Husain advice on how to best coach the puppet CEO before her testimony, including what she should say and how she should say it.

155.   Jaclin and Husain agreed that the less the puppet CEO testified about Husain's involvement in PR Complete, the better.

156.   Husain, Jaclin, and the puppet CEO agreed to obstruct the SEC's proceedings, by concealing the facts surrounding Husain's true involvement.

**E.   Husain's and Jaclin's Roles in the Fraud and Registration Violations**

      **1.   Husain's Admissions in His Plea Agreement**

157.   Husain has pled guilty in *U.S. v. Husain*, No. CR 14-149 RS (N.D. Cal.).  As part of that plea he has admitted his role and Jaclin's role in the illegal scheme alleged above.

158.   In his plea agreement, Husain admitted:

      (a)   Husain hired Jaclin to advise him regarding the formation of the shell companies and to help prepare the corporate documents, including SEC filings;

      (b)   from 2008 to at least 2011, Husain "controlled various publicly traded 'shell corporations,'" and he "directed CEOs to form many of these shell corporations and controlled the actions taken by the CEOs;"

      (c)   Jaclin and Husain "agreed that [Husain] should be considered as a 'consultant' only, even though [he] exercised control over the companies;"

      (d)   Husain kept his name off of the corporate documents because Jaclin told Husain that the SEC would be unlikely to approve the registration statements if he were disclosed to be an officer or controlling shareholder;

      (e)   under Jaclin's guidance, Husain recruited people whose "names appeared on the corporate documents and bank accounts as the company CEOs and officers but who did not exercise any actual control over the companies;"

      (f)   Jaclin was "fully aware" that Husain had "final authority on all

31

matters involving the companies;"

(g)   Husain knew that "the shell companies [he] was creating were valuable because they allowed the people who acquired them to completely control the shares and corporate actions of the companies that otherwise appeared to be legitimate public companies;"

(h)   Husain agreed with Jaclin and the nominee CEO of PR Complete to obstruct the proceedings of the SEC by concealing facts surrounding my true involvement in PR Complete; and

(i)   specifically, with advice from Jaclin, Husain "coached" the nominee CEO of PR Complete "how to testify" in testimony before the SEC, and "instructed her to testify falsely by leaving my name out of it" and "to withhold facts about my involvement" with the company.

## 2.   Husain's Role

159.   Husain knowingly, or at least recklessly or negligently, carried out deceptive acts and engaged in a course of business in furtherance of a scheme to defraud.

160.   Husain was the architect and prime mover of the fraudulent scheme by running the shell factory, by overseeing, directing, and controlling each part of its operation, specifically:

(a)   formulating the shell companies' business plans, which would never be implemented, to give the appearance of a legitimate business;

(b)   locating puppet CEOs to hide his shell factory activities, including his control of each shell company;

(c)   paying the puppet CEOs a monthly salary to reduce regulatory scrutiny;

(d)   conducting sham private placements, using cash payments, Straw Shareholders, and forged documents, to make it appear as if the shell companies had actual investors;

32

(e)     working with Jaclin to create materially false and misleading Registration Statements and Periodic Reports;

(f)     making and obtaining money by means of materially false and misleading information;

(g)     providing materially false and misleading information, including documents from the sham public offering and forged background information documents, to the market makers and transfer agents for the FINRA Form 211 application process;

(h)     using email accounts that Husain created to make it appear as if the puppet CEO was approving SEC filings;

(i)     selling seven of the nine shell companies, through nominee-representatives, for profit, by selling all of the stock, to purchasers he knew would offer and sell the shares publicly;

(j)     approving a post-effective Form S-1 amendment and a Form 10-K that were materially false and misleading to facilitate the sale of two shell companies;

(k)     attempting to obstruct regulatory oversight of the shell factory scheme by causing the deletion of emails and coaching a puppet CEO to lie in an SEC investigation; and

(l)     failing to exercise reasonable prudence in preparing the shell companies' SEC filings.

161.   Also, on behalf of the shell companies, Husain directed, reviewed and approved the content of the SEC filings that were false and misleading:

(a) The shell companies' Registration Statements:  (1) falsely stated that the puppet CEOs were the officers, directors, and employees of the shell companies, whereas Husain was the undisclosed control person and promoter; (2) misrepresented the shell companies' business purpose by stating the companies would act in accordance with their business plans, whereas the actual operations

of the shell companies consisted only of turning the shell companies into public shells that could be sold; and (3) misrepresented that the Straw Shareholders purchased their shares in a private offering, were selling the shares for their own accounts in the registered offering, and were not affiliated with the shell companies' officers, directors, promoters, or beneficial owners, whereas the Straw Shareholders did not exist, or did not purchase or hold shares, or paid for the shares with cash that Husain provided, or were affiliated with Husain, on whose account the shares were actually offered.

(b) The Periodic Reports of the shell companies that became public reporting companies repeated the same misrepresentations found in the Registration Statements regarding Husain's role and the companies' sham business purposes.

(c) Additionally, the Health Directory Form 10-K and the Movie Trailer post-effective Form S-1 amendment falsely stated that each shell company had no plans, arrangement or understandings for a merger, whereas the purchasers had already paid portions of the purchase prices, and negotiations by Husain and Jaclin to sell the companies were underway.

162. Husain also provided false and misleading information to the market makers and transfer agents on behalf of the shell companies, for the filing of FINRA Form 211 applications, to enable market makers to publish quotes for the shell companies' stock, and in order to obtain DTC eligibility, to facilitate public trading.

(a) The Form 211 applications by the market makers incorporated by reference the companies' false and misleading Registration Statements.

(b) Husain completed, and submitted to the market maker, information statements and officer and director questionnaires for each shell company that repeated the false and misleading statements regarding his identity and role and the companies' sham business purposes.

(c) Husain had the puppet CEOs sign the information statement and questionnaire or forged their signatures.

163.   Husain also substantially assisted the shell companies' fraud of giving the false appearance that they were legitimate companies going public and of issuing materially and false misleading statements and omissions.  In short, he knew, or was reckless in not knowing, that the shell companies were committing fraud and issuing materially false and misleading Registration Statements and Periodic Reports, and he provided substantial assistance by:  approving the private placements, Registration Statements, and Periodic Reports; providing the market makers with false and misleading information statements and officer and director questionnaires; and responding to FINRA requests for more information during the Form 211 process.  Husain also provided substantial assistance by locating puppet CEOs; paying their salaries; conducting sham private placements; hiring counsel, accountants, and auditors; working with market makers and transfer agents; approving registration statements and periodic reports; and selling the shell companies.

164.   Husain also substantially assisted the Shell Company Purchaser's unregistered offers and sales of the shell companies' stock.  In short, he knew, or was reckless in not knowing, that six of the shell companies were, after their reverse mergers, offering and selling stock without an effective or filed registration statement.  Husain knowingly or recklessly conducted purported private placements to enable him to subsequently file Form S-1 registration statements for shares held by the Straw Shareholders.  He knew or was reckless in not knowing that because the shares had been placed in the names of Straw Shareholders, disguising his control over them, that the shares could appear to be eligible for subsequent sale without restrictive legends.  Husain knowingly or recklessly provided substantial assistance to enable the shell company stock sales into the over-the-counter market.  He approved the Registration Statements and worked

with market makers to obtain clearance from FINRA to publish quotes for the shares of stock of the shell companies publicly sold by the Shell Company Purchasers, thereby providing those purchasers access to the public markets to distribute the shares. He sold them shares that they subsequently offered and sold in an unregistered distribution. To do so, Husain filled in the stock powers signed by the Straw Shareholders and provided them to Jaclin so that he could in turn provide them to the transfer agent in connection with the reissuance of the share certificates without restrictive legends in the names of the Shell Company Purchasers. Husain found a shareholder representative to sign, on behalf of the Straw Shareholders, the documents for the sale of the shell companies. Husain approved the filing of a post-effective amendment for Movie Trailer as part of that sale. Husain also knew or was reckless in not knowing that the Shell Company Purchasers bought the shares from him with a view to engaging in a distribution.

165. Husain received between $215,000 and $425,000 for each shell company sale, and obtained that money through the fraudulent scheme and by means of the false statements alleged above.

### 3. Jaclin's Role

166. Jaclin knowingly, or at least recklessly or negligently, carried out deceptive acts and engaged in a course of business in furtherance of the fraudulent shell factory scheme. Jaclin's deceptive conduct consisted of him:

(a) advising Husain to secretly remain in control of the entire shell-making operation, including the puppet CEOs and Straw Shareholders, while preparing registration statements which described the shell companies as actual development stage companies with bona fide CEOs and which concealed Husain's identity and control over both company management and the Straw Shareholders;

(b) telling Husain to pay the puppet CEOs a salary to avoid regulatory scrutiny;

(c) instructing Husain to obtain personal and cashier's checks

36

rather than money orders to avoid regulatory scrutiny;

(d)     approving materially false and misleading Registration Statements and Periodic Reports for filing;

(e)     instructing his law firm to send the market makers the subscription documents, checks, and money orders from the sham private placements for their review and inclusion in their Form 211 applications to FINRA;

(f)     locating Shell Company Purchasers for the shell companies and preparing merger documents for their purchase of the companies, knowing they would offer and sell the shares of the companies publicly;

(g)     suggesting that Husain create email accounts that appeared to be those of the puppet CEOs but that Husain actually used, to hide Husain's identity and role as control person;

(h)     approving a post-effective Form S-1 amendment and a Form 10-K that were materially false and misleading to facilitate the sale of two shell companies; and

(i)     attempting to obstruct regulatory oversight of the shell factory scheme by causing the deletion of emails and conspiring to have a puppet CEO of a shell company testify falsely; and

(j)     failing to exercise reasonable prudence in preparing the shell companies' SEC filings.

167.  Jaclin also substantially assisted the shell companies' and Husain's fraud of giving the false appearance that they were legitimate companies going public, and substantially assisted the shell companies' fraud of issuing materially and false misleading statements and omissions.  In short, Jaclin knew, or was reckless in not knowing, that Husain and the shell companies were committing fraud, and that the shell companies were issuing materially false and misleading Registration Statements and Periodic Reports, and he provided substantial

assistance by approving the private placements, Registration Statements, and Periodic Reports; providing the market makers with documents from the sham private placements and responding to FINRA requests for more information during the Form 211 process; suggesting that Husain create email accounts that appeared to be those of the puppet CEOs but that Husain actually used, to hide Husain's identity and role as control person; locating potential Shell Company Purchasers; and providing legal and escrow services in the reverse mergers, including his role in preparing and filing the Movie Trailer post-effective amendment and the Health Directory Form 10-K.

168.   Jaclin also substantially assisted Husain's and the Shell Company Purchasers' unregistered offers and sales of the shell companies' stock.  In short, Jaclin knew, or was reckless in not knowing, that the shares of stock of the seven shell companies offered and sold by Husain to the Shell Company Purchasers, and the shares of stock of the six shell companies publicly offered and sold shortly thereafter by the Shell Company Purchasers, were offered and sold without an effective or filed registration statement.  Jaclin knew or was reckless in not knowing that the purpose of the series of transactions in which he assisted Husain was to facilitate the sale of stock to the public.  Jaclin approved the Registration Statements and worked with market makers to obtain clearance from FINRA to publish quotes for the shell companies' shares, thereby providing the Shell Company Purchasers access to the public markets to distribute the shares.  Jaclin found six of the purchasers for the shell companies.  Jaclin signed letters to the transfer agents to cancel the share certificates in the names of the Straw Shareholders and reissue the certificates without restrictive legends in the names of the Shell Company Purchasers.  Jaclin prepared the documentation for the share sales and acted as escrow agent for each reverse merger.  Jaclin filed a post-effective amendment for Movie Trailer as part of that sale.

169.   Jaclin's law firm received nearly $225,000 in attorneys' fees for his

role in the fraudulent scheme.

**F.    Tolling Agreements**

170.    Husain's and Jaclin's fraudulent scheme was an ongoing and continuing fraud that began in 2008 or earlier, and continued through at least 2013. Their continuing fraudulent scheme was still ongoing on and after March 1, 2011.

171.    Husain and Jaclin entered into agreements with the SEC to toll the running of any statute of limitations for any action or proceeding against them, including any sanctions or relief that may be sought or imposed in such action or proceeding, from March 1, 2016 through May 12, 2016.  This action was first commenced in that tolling period, on May 12, 2016.

## FIRST CLAIM FOR RELIEF

### Unregistered Offer and Sale of Securities

### Violations of Sections 5(a) and 5(c) of the Securities Act

### (against Defendants Husain and Jaclin)

172.    The SEC realleges and incorporates by reference paragraphs 1 through 171 above.

173.    Husain and Jaclin created and operated a shell factory for the purpose of creating sham public companies that could be sold to purchasers who intended to distribute the companies' shares to the public markets.

174.    The shares of stock of certain shell companies that Husain offered and sold to the Shell Company Purchasers and that the Shell Company Purchasers shortly thereafter sold in public sales, as alleged above and listed in Appendices 3 and 4, were "securities" as defined by the Securities Act and the Exchange Act.

175.    The offers and sales of stock in New Image, PR Complete, Ciglarette, Rapid Holdings, Resume in Minutes, Health Directory and Movie Trailer to Shell Company Purchasers, and the public offers and sales shortly thereafter by those purchasers of the stock in New Image, PR Complete, Ciglarette, Rapid Holdings, Health Directory and Movie Trailer, were not registered with the SEC.  No valid

registration statement was filed or in effect for those sales, and no exemption from registration applied.

176.   Because he was an undisclosed control person and promoter who controlled the shell companies' shares at the time of the mergers, Husain served as the issuer of the shell companies' shares when they were sold to the Shell Company Purchasers in reverse mergers or similar transactions.  Because the Shell Company Purchasers obtained those shares with a view to distributing them publicly and began trading within days or months of the mergers, the Shell Company Purchasers served as underwriters when they obtained their shares from Husain, an issuer.

177.   Although Husain and Jaclin filed the Form S-1 Registration Statements with the SEC for the shell companies, these Registration Statements purported to register securities transactions by the Straw Shareholders, not Husain. No registration statements were filed to register the sale of securities by Husain to the Shell Company Purchasers.  Likewise, no registration statement or exemption applied to the Shell Company Purchasers' distribution of shares to the market within ninety days of the mergers.  For example, (1) the regulation that exempts private transactions from registration did not apply to the sales to the Shell Company Purchasers because the shares were sold by an issuer (Husain) to underwriters (the Shell Company Purchasers) and (2) the regulation that exempts transactions for persons other than issuers, underwriters and dealers did not apply to the public offerings by the Shell Company Purchasers because they were acting as underwriters.

178.   Husain and Jaclin were necessary participants and substantial factors in these unregistered offerings, because they created and operated the shell factory and took the steps necessary to enable the unregistered offer and sale of their shares to the Shell Company Purchasers and to the public markets.  But for the conduct of Husain and Jaclin, the unregistered offerings of the shell companies'

1    shares would not have occurred.

2    179.   Husain and Jaclin, and each of them, by engaging in the conduct

3    described above, directly or indirectly, made use of means or instruments of

4    transportation or communication in interstate commerce or of the mails, to offer to

5    sell or to sell securities, or to carry or cause such securities to be carried through

6    the mails or in interstate commerce for the purpose of sale or for delivery after

7    sale.

8    180.   By engaging in the conduct described above, defendants Husain and

9    Jaclin have violated, and unless restrained and enjoined will continue to violate,

10   Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

11                       **SECOND CLAIM FOR RELIEF**

12                       **Aiding and Abetting Violations of**

13              **Sections 5(a) and 5(c) of the Securities Act**

14                  **(against Defendants Husain and Jaclin)**

15   181.   The SEC realleges and incorporates by reference paragraphs 1

16   through 180 above.

17   182.   As alleged above, the offers and sales of stock in New Image, PR

18   Complete, Ciglarette, Rapid Holdings, Resume in Minutes, Health Directory and

19   Movie Trailer to Shell Company Purchasers were not registered with the SEC.  No

20   valid registration statement was filed or in effect for those sales, and no exemption

21   from registration applied.  Husain, as the issuer of these shares, thus violated

22   Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c), by

23   offering and selling securities to the public in those unregistered transactions, for

24   which no registration statement was on file or in effect.

25   183.   In connection with those unregistered offerings, Jaclin knowingly or

26   recklessly provided substantial assistance to Husain's violations of Sections 5(a)

27   and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).  Jaclin was aware or

28   was reckless in not being aware that his conduct and the substantial assistance he

provided Husain in perpetrating the violations were improper.

184.   As alleged above, the public offers and sales by the Shell Company Purchasers of the stock in New Image, PR Complete, Ciglarette, Rapid Holdings, Health Directory and Movie Trailer, were not registered with the SEC.  No valid registration statement was filed or in effect for those sales, and no exemption from registration applied.  The Shell Company Purchasers thus violated Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c), by offering and selling securities to the public in those unregistered transactions, for which no registration statement was on file or in effect.

185.   In connection with those unregistered offerings, Husain and Jaclin knowingly or recklessly provided substantial assistance to the Shell Company Purchasers' violations of Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).  Husain and Jaclin were each aware or were each reckless in not being aware that their conduct and the substantial assistance they provided the Shell Company Purchasers in perpetrating the violations were improper.

186.   By engaging in the conduct described above, defendants Husain and Jaclin aided and abetted and, unless enjoined, are reasonably likely to continue to aid and abet, violations of Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c), pursuant to Section 15(b) of the Securities Act, 15 U.S.C. § 77o(b).

### THIRD CLAIM FOR RELIEF

**Scheme to Defraud in the Offer or Sale of Securities**

**Violations of Section 17(a)(1) and (a)(3) of the Securities Act**

**(against Defendants Husain and Jaclin)**

187.   The SEC realleges and incorporates by reference paragraphs 1 through 186 above.

188.   Husain and Jaclin each engaged in a scheme to defraud by creating and operating a shell factory through which sham companies with no business

purpose and with materially misleading SEC filings were sold to purchasers, who intended to distribute the companies' shares publicly.  Husain and Jaclin engaged in numerous deceptive acts to conceal the shell factory and to maintain the sham companies' false appearance to the public markets, regulators, market makers, and transfer agents, including by using puppet CEOs, sham private placements and shell company sales with Straw Shareholders, and fake email accounts, and by deleting emails and coaching a witness to lie under oath in SEC investigative testimony.

189.   Husain and Jaclin, and each of them, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails:  (a) with scienter, employed devices, schemes, or artifices to defraud; or (b) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

190.   By engaging in the conduct described above, defendants Husain and Jaclin violated, and unless restrained and enjoined, will continue to violate, Section 17(a)(1) and (a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(1), (3).

## FOURTH CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Section 17(a)(2) of the Securities Act

### (against Defendants Husain and Jaclin)

191.   The SEC realleges and incorporates by reference paragraphs 1 through 190 above.

192.   Husain and Jaclin each obtained money by means of material misrepresentations and omissions to investors and prospective investors, as well as to regulators, market makers and transfer agents, regarding, among other things, the sham companies' business purposes, Husain's identity and role as the control person and promoter of the companies, the Straw Shareholders' and puppet CEOs'

1   true nature, and in two instances, the existence of merger plans.

2       193.   Husain and Jaclin, and each of them, by engaging in the conduct

3   described above, directly or indirectly, in the offer or sale of securities by the use

4   of means or instruments of transportation or communication in interstate

5   commerce or by use of the mails, obtained money or property by means of untrue

6   statements of a material fact or by omitting to state a material fact necessary in

7   order to make the statements made, in light of the circumstances under which they

8   were made, not misleading.

9       194.   By engaging in the conduct described above, defendants Husain and

10  Jaclin violated, and unless restrained and enjoined, will continue to violate, Section

11  17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

12  **<u>FIFTH CLAIM FOR RELIEF</u>**

13  **Aiding and Abetting Violations of Section 17(a) of the Securities Act**

14  **(against Defendants Husain and Jaclin)**

15      195.   The SEC realleges and incorporates by reference paragraphs 1

16  through 194 above.

17      196.   As alleged above, Husain engaged in a fraudulent scheme to defraud

18  by creating and operating a shell factory through which sham companies with no

19  business purpose and with materially misleading SEC filings were sold to

20  purchasers, who intended to distribute the companies' shares publicly.  Husain also

21  obtained money by means of material misrepresentations and omissions to

22  investors and prospective investors, as well as to regulators, market makers and

23  transfer agents.  Husain thus violated Section 17(a)(1), (a)(2) and (a)(3) of the

24  Securities Act, 15 U.S.C. § 77q(a)(1), (2), (3).

25      197.   Jaclin knowingly or recklessly provided substantial assistance to

26  defendant Husain's violations of Section 17(a)(1), (a)(2) and (a)(3) of the

27  Securities Act, 15 U.S.C. § 77q(a)(1), (2), (3).  Jaclin was aware or was reckless in

28  not being aware that his conduct and the substantial assistance he provided Husain

in perpetrating the violations were improper.

198.   As alleged above, the shell companies themselves engaged in a fraudulent scheme to defraud by operating as sham companies with no business purpose and by issuing materially misleading SEC filings to purchasers, who intended to distribute the companies' shares publicly.  The companies also obtained money by means of material misrepresentations and omissions to investors and prospective investors, as well as to regulators, market makers and transfer agents.  The shell companies thus violated Section 17(a)(1), (a)(2) and (a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(1), (2), (3).

199.   Husain and Jaclin knowingly or recklessly provided substantial assistance to defendant the shell companies' violations of Section 17(a)(1), (a)(2) and (a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(1), (2), (3).  Husain and Jaclin were each aware or were each reckless in not being aware that their conduct and the substantial assistance they provided the shell companies in perpetrating the violations were improper.

200.   By engaging in the conduct described above, defendants Husain and Jaclin aided and abetted and, unless enjoined, are reasonably likely to continue to aid and abet, violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), pursuant to Section 15(b) of the Securities Act, 15 U.S.C. § 77o(b).

## SIXTH CLAIM FOR RELIEF

**Scheme to Defraud in Connection with the Purchase or Sale of Securities**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a), (c)**
**(against Defendants Husain and Jaclin)**

201.   The SEC realleges and incorporates by reference paragraphs 1 through 200 above.

202.   Husain and Jaclin each engaged in a scheme to defraud by creating and operating a shell factory through which sham companies with no business purpose and with materially misleading SEC filings were sold to purchasers, who

1    intended to distribute the companies' shares publicly.  Husain and Jaclin engaged

2    in numerous deceptive acts to conceal the shell factory and to maintain the sham

3    companies' false appearance to the public markets, regulators, market makers, and

4    transfer agents, including by using puppet CEOs, sham private placements and

5    shell company sales with Straw Shareholders, and fake email accounts, and by

6    deleting emails and coaching a witness to lie under oath.

7              (a)     Husain and Jaclin, by engaging in the conduct described above,

8    directly or indirectly, in connection with the purchase or sale of a security, by the

9    use of means or instrumentalities or interstate commerce, of the mails, or of the

10   facilities of a national securities exchange, with scienter:  (a) employed devices,

11   schemes, or artifices to defraud; or (b) engaged in acts, practices or courses of

12   business which operated or would operate as a fraud or deceit upon other persons.

13   203.   By engaging in the conduct described above, defendants Husain and

14   Jaclin violated, and unless restrained and enjoined, will continue to violate, Section

15   10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a) and (c)

16   thereunder, 17 C.F.R. § 240.10b-5(a), (c).

17                    **SEVENTH CLAIM FOR RELIEF**

18           **Fraud in Connection with the Purchase or Sale of Securities**

19         **Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)**

20                         **(against Defendant Husain)**

21   204.   The SEC realleges and incorporates by reference paragraphs 1

22   through 203 above.

23   205.   Husain made material misrepresentations and omissions to investors

24   and prospective investors, as well as to regulators, market makers and transfer

25   agents, regarding, among other things, the sham companies' business purposes,

26   Husain's identity and role as the control person and promoter of the companies, the

27   Straw Shareholders' and puppet CEOs' true nature, and in two instances, the

28   existence of merger plans.

206.   Husain, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities or interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter, made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

207.   By engaging in the conduct described above, defendant Husain violated, and unless restrained and enjoined, will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

## EIGHTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of Section 10(b)
### of the Exchange Act and Rule 10b-5(a), (b) and (c)
### (against Defendants Husain and Jaclin)

208.   The SEC realleges and incorporates by reference paragraphs 1 through 207 above.

209.   As alleged above, Husain engaged in a fraudulent scheme to defraud by creating and operating a shell factory through which sham companies with no business purpose and with materially misleading SEC filings were sold to purchasers, who intended to distribute the companies' shares publicly.  Husain also made, in connection with the purchase or sale of securities, material misrepresentations and omissions to investors and prospective investors, as well as to regulators, market makers and transfer agents.  Husain thus violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a), (b) and (c) thereunder, 17 C.F.R. § 240.10b-5(a), (b), (c).

210.   Jaclin knowingly or recklessly provided substantial assistance to defendant Husain's violations of Section 10(b) of the Exchange Act, 15 U.S.C. §

78j(b), and Rule 10b-5(a), (b) and (c) thereunder, 17 C.F.R. § 240.10b-5(a), (b), (c).  Jaclin was aware or was reckless in not being aware that his conduct and the substantial assistance he provided Husain in perpetrating the violations were improper.

211.   As alleged above, the shell companies themselves engaged in a fraudulent scheme to defraud by operating as sham companies with no business purpose and by issuing materially misleading SEC filings to purchasers, who intended to distribute the companies' shares publicly.  The companies also made, in connection with the purchase or sale of securities, material misrepresentations and omissions to investors and prospective investors, as well as to regulators, market makers and transfer agents.  The shell companies thus violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a), (b) and (c) thereunder, 17 C.F.R. § 240.10b-5(a), (b), (c).

212.   Husain and Jaclin knowingly or recklessly provided substantial assistance to defendant the shell companies' violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a), (b) and (c) thereunder, 17 C.F.R. § 240.10b-5(a), (b), (c).  Husain and Jaclin were each aware or were each reckless in not being aware that their conduct and the substantial assistance they provided the shell companies in perpetrating the violations were improper.

213.   By engaging in the conduct described above, defendants Husain and Jaclin aided and abetted and, unless enjoined, are reasonably likely to continue to aid and abet, violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e).

## NINTH CLAIM FOR RELIEF

**Aiding and Abetting Violations of Section 15(d) and**

**Rules 12b-20, 15d-1, and 15d-13 of the Exchange Act**

**(against Defendants Husain and Jaclin)**

214.   The SEC realleges and incorporates by reference paragraphs 1 through 213 above.

215.   Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d), requires the filing of annual and quarterly reports in conformity with the SEC's rules and regulations.  Rule 15d-1 of the Exchange Act, 17 C.F.R. § 240.15d-1, requires the filing of accurate annual reports, and Rule 15d-13 of the Exchange Act, 17 C.F.R. § 240. 15d-13, requires the filing of accurate quarterly reports.  Rule 12b-20 of the Exchange Act, 17 C.F.R. § 240.12b-20, requires an issuer to include in its annual and quarterly reports material information as may be necessary to make the required statements, in light of the circumstances in which they were made, not misleading.

216.   The shell companies New Image, PR Complete, Ciglarette, Resume in Minutes, Rapid Holdings, Movie Trailer, Health Directory, and Comp Services filed annual and quarterly reports containing material misrepresentations and omissions regarding, among other things, the sham companies' business purposes, Husain's identity and role as the control person and promoter of the companies, the Straw Shareholders' and puppet CEOs' true nature, and in two instances, the existence of merger plans

217.   The shell companies New Image, PR Complete, Ciglarette, Resume in Minutes, Rapid Holdings, Movie Trailer, Health Directory, and Comp Services filed periodic reports under Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d) that violated Section 15(d) and Rules 12b-20, 15d-1, 15d-13 of the Exchange  Act, 15  U.S.C. § 78o(d)  and  17  C.F.R.  §§ 240.12b-20, 240.15d-1, and 240.15d-13.

218.   Husain and Jaclin knowingly or recklessly provided substantial assistance to the shell companies' violations of Section 15(d) and Rules 12b-20, 15d-1, and 15d- 13 of the Exchange Act, 15 U.S.C. § 78o(d) and 17 C.F.R. §§ 240.12b- 20, 240.15d-1, and 240.15d-13.  Husain and Jaclin were each aware or were each reckless in not being aware that their conduct and the substantial

assistance they provided the shell companies in perpetrating the violations was improper.

219.   By engaging in the conduct described above, defendants Husain and Jaclin aided and abetted and, unless enjoined, are reasonably likely to continue to aid and abet, violations of Section 15(d) and Rules 12b-20, 15d-1, and 15d-13of the Exchange Act, 15 U.S.C. § 78o(d) and 17 C.F.R. §§ 240.12b-20, 240.15d-1, and 240.15d-13, pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e).

## TENTH CLAIM FOR RELIEF

### Section 20(a) Control Person Violations of
### Section 10(b) of the Exchange Act and Rule 10b-5(a)-(c)
### (against Defendant Husain)

220.   The SEC realleges and incorporates by reference paragraphs 1 through 219 above.

221.   As alleged above, the shell companies engaged in a scheme to defraud by operating as sham companies with no business purpose and with materially misleading SEC filings, which were sold to purchasers who intended to distribute the companies' shares publicly.  The shell companies also made, in connection with the purchase or sale of securities, material misrepresentations and omissions to investors and prospective investors, as well as to regulators, market makers and transfer agents.  Certain shell companies also filed annual and quarterly reports containing material misrepresentations and omissions, and filed periodic reports that violated the securities laws and regulations.

222.   Pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), as the person who, directly or indirectly, controlled the shell companies, Husain is liable jointly and severally with and to the same extent as the shell companies for the above-referenced violations of the Exchange Act and rules and regulations thereunder committed by the shell companies.  Husain did not act in good faith, and directly or indirectly induced the act or acts that constituted the above-

referenced violations of the Exchange Act and the rules and regulations thereunder committed by the shell companies.

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

### **I.**

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

### **II.**

Issue orders, in a form consistent with Fed. R. Civ. P. 65(d), permanently enjoining Defendants and their agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 5(a) and (c) and 17(a) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), and 77q(a), and Sections 10(b) and 15(d) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78o(d), and Rules 10b-5, 15d-1, and 15d-3 thereunder, 17 C.F.R. §§ 240.10b-5, 240.15d-1, and 240.15d-3.

### **III.**

Order Defendants, jointly and severally, to disgorge all ill-gotten gains from their illegal conduct, together with prejudgment interest thereon.

### **IV.**

Order Defendants to pay civil penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d) and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

### **V.**

Enter an order against defendant Husain, pursuant to Sections 20(e) and 20(g) of the Securities Act, 15 U.S.C. § 77t(e), (g), and Sections 2l(d)(2) and 21(d)(6) of the Exchange Act, 15 U.S.C. § 78u(d)(2), (6), prohibiting him from: (1) acting as an officer or director of any issuer that has a class of securities

registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l or that is required to file reports pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d); and (2) prohibiting him from participating in an offering of penny stock; and enter an order against defendant Jaclin, pursuant to Section 20(g) of the Securities Act, 15 U.S.C. § 77t(g), and Section 21(d)(6) of the Exchange Act, 15 U.S.C. § 78u(d)(6), prohibiting him from participating in an offering of penny stock.

## VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VII.

Grant such other and further relief as this Court may determine to be just and necessary.


Dated:  November 22, 2016                    Respectfully Submitted,


                                             /s/Amy Jane Longo
                                             Amy Jane Longo
                                             Roberto A. Tercero
                                             Attorneys for Plaintiff
                                             Securities and Exchange Commission

**APPENDIX 1:**
**REGISTRATION STATEMENTS FILED BY THE SHELL COMPANIES**

| Shell Company | Form S-1 Reg. Stmt. | Date Filed (Effective Date, if any) |
|---|---|---|
| New Image | S-1 | 3/18/08 |
| | S-1/A #1 | 4/1/08 (4/4/08) |
| | POS AM | 9/23/09 (9/29/09) |
| PR Complete | S-1 | 11/7/08 |
| | S-1/A #1 | 12/15/08 |
| | S-1/A #2 | 1/5/09 (1/16/09) |
| | POS AM | 9/23/09 (9/24/09) |
| Ciglarette | S-1 | 4/28/10 |
| | S-1/A #1 | 5/18/10 |
| | S-1/A #2 | 6/9/10 |
| | S-1/A #3 | 6/15/10 |
| | S-1/A #4 | 6/22/10 |
| | S-1/A #5 | 6/24/10 |
| | S-1/A #6 | 6/24/10 (6/24/10) |
| Resume in Minutes | S-1 | 5/11/10 |
| | S-1/A #1 | 6/23/10 |
| | S-1/A #2 | 7/15/10 |
| | S-1/A #3 | 7/20/10 |
| | S-1/A #4 | 7/23/10 (7/27/10) |
| Rapid Holdings | S-1 | 7/2/10 |
| | S-1/A #1 | 8/9/10 |
| | S-1/A #2 | 8/19/10 |
| | S-1/A #3 | 8/27/10 |

| Shell Company | Form S-1 Reg. Stmt. | Date Filed (Effective Date, if any) |
|---|---|---|
| | S-1/A #4 | 9/2/10 |
| | S-1/A #5 | 9/10/10 |
| | S-1/A #6 | 9/23/10 |
| | S-1/A #7 | 10/1/10 |
| | S-1/A #8 | 10/5/10 (10/8/10) |
| Health Directory | S-1 | 5/27/11 |
| | S-1/A #1 | 7/14/11 |
| | S-1/A #2 | 8/12/11 |
| | S-1/A #3 | 9/21/11 |
| | S-1/A #4 | 10/4/11 (10/19/11) |
| Movie Trailer | S-1 | 10/15/10 |
| | S-1/A #1 | 12/16/10 |
| | S-1/A #2 | 1/19/11 |
| | S-1/A #3 | 2/9/11 |
| | S-1/A #4 | 3/2/11 |
| | S-1/A #5 | 3/18/11 (3/25/11) |
| | POS AM | 9/4/12 (9/12/12) |
| Comp Services | S-1 | 12/20/11 |
| | S-1/A #1 | 1/27/12 |
| | S-1/A #2 | 2/22/12 |
| | S-1/A #3 | 3/14/12 |
| | S-1/A #4 | 4/10/12 |
| | S-1/A #5 | 4/23/12 |
| | S-1/A #6 | 4/26/12 |
| | S-1/A #7 | 4/30/12 (5/4/12) |

| Shell Company | Form S-1 Reg. Stmt. | Date Filed (Effective Date, if any) |
|---|---|---|
| Counseling International | S-1 | 8/8/12 |
| | S-1/A #1 | 9/25/12 |
| | S-1/A #2 | 11/19/12 |
| | S-1/A #3 | 12/19/12 |
| | S-1/A #4 | 1/9/13 |

### APPENDIX 2:
### PERIODIC FILINGS BY EIGHT OF THE SHELL COMPANIES

| Shell Company | Periodic Report | Date Filed |
|---|---|---|
| New Image | 10-Q 1Q 08 | 5/13/08 |
| | 10-Q/A 1Q 08 | 6/23/08 |
| | 10-Q Q2 08 | 8/11/08 |
| | 10-Q/A 2Q 08 | 8/22/08 |
| | 10-K FY 08 | 3/23/09 |
| | 10-Q 2Q 09 | 8/3/09 |
| | 10-K/A FY08 | 9/30/09 |
| | 10-Q/A 2Q 09 | 9/30/09 |
| | 10-Q 3Q 09 | 11/12/09 |
| PR Complete | 10-K FY 08 | 3/23/09 |
| | 10-Q 1Q 09 | 5/11/09 |
| | 10-Q 2Q 09 | 8/6/09 |
| | 10-K/A FY 08 | 9/25/09 |
| | 10-Q/A 1Q 09 | 9/25/09 |
| | 10-Q/A 2Q 09 | 9/25/09 |
| | 10-Q 3Q 09 | 11/16/09 |
| Ciglarette | 10-Q 1Q 10 | 7/20/10 |
| | 10-Q 2Q 10 | 11/4/10 |
| | 10-Q 3Q 10 | 1/10/11 |
| Resume in Minutes | 10-Q 2Q 10 | 8/31/10 |
| | 10-Q 3Q 10 | 11/15/10 |
| | 10-K FY 10 | 3/31/11 |
| | 10-Q 1Q 11 | 5/16/11 |
| Rapid Holdings | 10-Q 2Q 10 | 11/22/10 |
| | 10-Q 3Q 10 | 1/12/11 |
| | 10-Q 4Q 10 | 4/14/11 |

| Shell Company | Periodic Report | Date Filed |
|---|---|---|
| Health Directory | 10-Q 2Q 12 | 11/19/11 |
| | 10-Q/A 2Q 11 | 12/16/11 |
| | 10-Q 3Q 12 | 2/12/12 |
| | 10-K FY 12 | 6/28/12 |
| Movie Trailer | 10-Q Q2 11 | 5/9/11 |
| | 10-Q Q3 11 | 7/15/11 |
| | 10-K FY 11 | 11/29/11 |
| Comp Services | 10-Q 2Q 12 | 6/14/12 |
| | 10-Q 3Q 12 | 9/12/12 |
| | 10-K FY 12 | 1/29/13 |
| | 10-Q Q3 13 | 9/23/13 |

## APPENDIX 3:
## THE SALES OF SEVEN OF THE SHELL COMPANIES

| Shell Company | Sale Date | Sales Price |
|---|---|---|
| New Image | 12/7/2009 | $215,000 |
| PR Complete | 12/4/2009 | $240,000 |
| Ciglarette | 3/1/2011 | $275000 |
| Rapid Holdings | 5/11/2011 | $367,000 |
| Resume in Minutes | 6/24/11 | $350,000 |
| Health Directory | 7/20/2012 | $425,000 |
| Movie Trailer | 9/11/2012 | $370,000 |

### APPENDIX 4:
### PUBLIC OFFER AND SALE OF SIX
### OF THE SHELL COMPANIES' STOCK WITHIN NINETY DAYS

| Shell Company Name Before Merger | Shell Company Name After Merger | Merger Date | Date of First Public Offer and Sale Following Merger |
|---|---|---|---|
| New Image | Car Charging Group, Inc. | 12/7/2009 | 12/14/2009 |
| PR Complete | YesDTC Holdings, Inc. | 12/4/2009 | 1/21/2010 |
| Ciglarette | Kirin International Holding, Inc. | 3/1/2011 | 3/14/2011 |
| Rapid Holdings | Izea Inc. | 5/11/2011 | 6/7/2011 |
| Health Directory | Sollensys Corp. | 7/20/12 | 10/15/2012 |
| Movie Trailer | Broadcast live Digital Corp. | 9/11/2012 | 10/23/2012 |

**PROOF OF SERVICE**

I am over the age of 18 years and not a party to this action.  My business address is:

    U.S. SECURITIES AND EXCHANGE COMMISSION,

    444 S. Flower Street, Suite 900, Los Angeles, California 90071

    Telephone No. (323) 965-3998; Facsimile No. (213) 443-1904.

On November 22, 2016, I caused to be served the document entitled **FIRST AMENDED COMPLAINT** on all the parties to this action addressed as stated on the attached service list:

☐    **OFFICE MAIL:**  By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices.  I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

    ☐    **PERSONAL DEPOSIT IN MAIL:**  By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service.  Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

    ☐    **EXPRESS U.S. MAIL:**  Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

☐    **HAND DELIVERY:**  I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

☐    **UNITED PARCEL SERVICE:**  By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Los Angeles, California.

☐    **ELECTRONIC MAIL:**  By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

☒    **E-FILING:**  By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

☐    **FAX:**  By transmitting the document by facsimile transmission.  The transmission was reported as complete and without error.

    I declare under penalty of perjury that the foregoing is true and correct.

Date:  November 22, 2016        */s/ Julian Cha*
                                      Julian Cha

**<u>SEC v. IMRAN HUSAIN and GREGG EVAN JACLIN</u>**
**United States District Court—Central District of California**
**Case No. 2:16-cv-03250-ODW (Ex)**
**<u>SERVICE LIST</u>**

George B. Newhouse, Jr., Esq.
Dentons US LLP
601 S. Figueroa St, Ste 2500
Los Angeles, CA 90017
T/213-892-2846
M/213-709-6387
George.newhouse@dentons.com
***Attorney for Defendant Imran Husain***

Jeffrey R. Thomas, Esq.
Thomas Law Firm, LLC
50 S. Steele St., Ste. 250
Denver, CO 80209
T/720-330-2805
F/720-330-2806
M/303-898-3124
jthomas@thomaslawllc.com
***Attorney for Defendant Gregg Evan Jaclin***