**O**

# United States District Court
# Central District of California

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case № 2:16-cv-03250-ODW (E) |
|         Plaintiff, | |
|     v. | **ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS [36, 38]** |
| IMRAN HUSAIN; GREGG EVAN JACLIN, | |
|         Defendants. | |

## I.    INTRODUCTION

This case involves "a shell factory scheme" engineered by Defendants Imran Husain and Gregg Jaclin.  Defendants' motions to dismiss Plaintiff Securities and Exchange Commission's first amended complaint and Defendants' motions to strike portions of the SEC's first amended complaint are now before the Court for decision. (ECF Nos. 36, 38.)   The Court **DENIES** Defendants' motions to dismiss in their entirety.  The Court also **DENIES** Defendants' motions to strike in their entirety.

## II.    FACTUAL BACKGROUND

**A. The Selling Process**

Husain is a businessman residing in Santa Monica, California, and Jaclin is a New Jersey securities attorney.  (FAC ¶¶ 17, 18.)  "In 2004, Husain sought Jaclin's legal advice about taking a company public.  (*Id.* ¶ 29.)  Jaclin introduced Husain to his "self-filing" method, which enables a promoter, such as Husain, to remain in total control of a shell corporation while taking it public.  (*Id.* ¶¶ 29, 35–36, 74.)  This method involves five steps: (1) filing articles of incorporation and completing a private placement of the corporation's stock with sham shareholders; (2) registering that private placement with the SEC; (3) obtaining clearance from the Financial Industry Regulatory Authority ("FINRA") to publish stock price quotations; (4) obtaining depository trust company ("DTC") eligibility "so that trades can be settled electronically"; and (5) filing periodic reports with the SEC to maintain the registration.  (*Id.* ¶¶ 30–34, 53.)  Provided that these five steps are completed successfully, the end result will be a publically-traded company that outwardly appears to have a diversity of ownership but which is in fact wholly-owned and operated by a single anonymous promoter.  (*Id.* ¶¶ 4, 63.)

At some point after their initial meeting, Husain and Jaclin, "acting together," began "utilizing Jaclin's model."  (*Id.* ¶ 40.)  In step one, Husain  recruited a puppet Chief Executive Officer (usually an acquaintance) to conceal his total control over the entity.  (*Id.* ¶¶ 42, 49, 51–52.)  He promised to pay this person a salary of $500–700 per month and created a business plan for the company that mirrored some personal interest or quality of the puppet CEO.[1]  (*Id.* ¶¶ 42, 44, 46.)  The puppet CEO then entered into an agreement with Jaclin, giving Jaclin's firm the right to conduct all legal work associated with incorporating the company and taking it public.  (*Id.* ¶ 47.)

After incorporating the company, Husain "organized a private offering" of the shell's stock to "35 individuals" who were shareholders "in name only."  (*Id.* ¶ 53.)

---

[1] Jaclin advised Husain that failure to pay the CEOs might arouse "suspicions."  (*Id.* ¶ 45.)

To effectuate the sales, Husain gave each shareholder "cash" to purchase stock.[2]  (*Id.* ¶ 55.)  On Jaclin's advice, purchases were generally made using personal checks to avoid regulatory scrutiny.  (*Id.* ¶¶ 57, 58.)  After the purchases were made, Jaclin's firm prepared a private placement memorandum based on the company's fake business plan and a subscription agreement documenting the stock's sale.  (*Id.* ¶ 54.) It also prepared investor questionnaires to make it appear that the sham investors were "bona fide."  (*Id.*)  At all times, Husain and Jaclin retained the stock that was allegedly "sold" to the sham investors, leaving the stock power unsigned to allow for true sales of the stock later when the shell eventually went public.  (*Id.* ¶¶ 60–61.)

In step two, Husain and Jaclin used the private placement as a basis for filing an S-1 registration form with the SEC.  (*Id.* ¶ 65.)  Husain provided the necessary documents and signatures of the puppet CEO to Jaclin, who, in conjunction with his firm, prepared the filings and drafted opinion letters indicating that "the shares in the offering had been duly authorized, legally issued, [and] fully paid."  (*Id.* ¶¶ 67, 73.)

The S-1 registration forms they submitted to the SEC falsely asserted that the puppet CEO was in charge of the company and that the company would operate "in accordance" with its business plan.  (*Id.* ¶¶ 65–66, 74.)  The registration forms also misrepresented that the shareholders "(1) purchased their shares in a private offering; (2) were selling the shares for their own account in the registered offering; (3) were not affiliated with any of the shell company's officers, directors, promoters, or any beneficial owner of 10% or more of the shell company's securities."  (*Id.* ¶ 74.) "These statements were false or misleading because: (1) some of the [sham investors] did not exist, much less purchase or hold shares; (2) the majority of the remaining [sham investors] paid for the shares with cash that Husain supplied through the recruiters; (3) Husain and Jaclin held the shares rather than the [sham investors]; (4) the shares under the offering were for Husain's account, not the [sham investors']

---

[2] Husain also used the names and social security numbers of dead people as sham investors.  (*Id.* ¶ 55.)

accounts; and (5) each [sham investor] was affiliated with Husain, who was the shell company's control person and promoter and controlled its securities." (*Id.*)

In step three, after successfully completing the registration process with the SEC, Husain and Jaclin worked with transfer agents and market makers to prepare the shell for FINRA approval. (*Id.* ¶¶ 77–83.) Husain provided the transfer agent with "shareholder" information and "Husain and Jaclin worked together with a market maker to file a FINRA Form 211." (*Id.* ¶¶ 77, 79.) As part of that process, Husain completed an "information statement" and an "officer and director questionnaire" which repeated the same "false and misleading statements" invoked to obtain SEC approval. (*Id.* ¶ 81.) To formalize the "information statements," Husain had the puppet CEO sign the document or "forged his or her signature." (*Id.* ¶ 82.) For his part, Jaclin provided copies of the "subscription agreements" and "investor checks" and answered all inquiries from FINRA regarding the filing. (*Id.* ¶ 83.)

In step four, after FINRA approval, Husain worked with the market maker and its associated transfer agent to obtain DTC eligibility. (*Id.* ¶ 85.) This "allows for electronic settlement of the stock . . . thereby enhancing the value of the shell company." (*Id.*)

In step five, Husain and Jaclin filed periodic reports (Forms 10-K and 10-Q) with the SEC to maintain the shell's registration. (*Id.* ¶¶ 89–90.) Husain "directed" the preparation of the periodic reports, and Jaclin's firm drafted the reports. (*Id.* ¶ 92.) These reports did not disclose Husain as the true control person and reported that the shells would operate according to their business plan rather than as nonfunctional entities that would soon be sold. (*Id.* ¶ 93.) Further, reports for two of the shells affirmatively indicated that the shells did not intend to merge with other companies, despite the fact that the shells had already agreed to do just that. (*Id.* ¶¶ 13, 116–117, 119–120, 122.)

"One-and-a-half to two years after incorporation" Husain and Jaclin sold the shell. (*Id.* ¶ 96.) In all, they created nine shells: Comp Services, Counseling

International, New Image, PR Complete, Ciglarette, Rapid Holdings, Resume in Minutes, Health Directory, and Movie Trailer.  (*Id.* ¶ 19.)  New Image, PR Complete, Ciglarette, Rapid Holdings, Resume in Minutes, Health Directory, and Movie Trailer were each sold for between $215,000 and $425,000, for a total of $2.25 million, to buyers Husain and Jaclin knew would sell stock in the shells publically.  (*Id.* ¶¶ 97, 160, 164, 168.)

Jaclin was responsible for finding buyers for six of the seven shells.  (*Id.* ¶ 99.) To effect the sale, Husain nominated a shareholder representative.  (*Id.* ¶ 101.) Jaclin's firm would then prepare stock purchase agreements and an escrow agreement. (*Id.* ¶¶ 102–103.)  After the agreements were ready, the escrow agent—in most cases Jaclin's firm—gathered the necessary stock certificates and stock powers and the funds from the shell's purchaser.  (*Id.* ¶ 104–105.)  Jaclin's firm then completed the transaction.  (*Id.*)

Funds from the shell's purchase would be placed into the shareholder nominee's bank account less Jaclin's legal fees.  (*Id.*)  The funds were then wired from the nominee's bank account into Husain's account.  (*Id.* ¶ 106.)

In conjunction with the sale, Jaclin would issue an opinion letter telling the transfer agent to cancel all of the sham investors' stock and reissue the stock.  (*Id.* ¶ 107.)  "After the sale of each shell company, the shell company's puppet CEO resigned and new management was installed."  (*Id.* ¶ 110.)  The "new management" would then file a Form 8-K with the SEC, changing the company's name and business model.  (*Id.* ¶ 111.)  Six of the seven purchased shells began selling stock to the public within ninety days.  (*Id.* ¶ 124, App'x 4.)

**B. Additional Relevant Considerations**

**1. Troubles with the SEC**

Two of the shells ran into trouble with the SEC after being sold by Husain and Jaclin.  The SEC suspended trading in PR Complete (which changed its name to YesDTC Holdings) on November 17, 2014, and on February 25, 2015, a court in the

Northern District of California entered a judgment against its new CEO for his use of the shell in a pump and dump scheme. (*Id.* ¶ 21.) The SEC also suspended trading of Movie Trailer (which changed its name to Broadcast Live Digital Corporation) on March 7, 2014, "citing questions about the accuracy of publically available information concerning its business operations." (*Id.* ¶ 25.) Finally, before Husain and Jaclin could sell Comp Services and Counseling International, the SEC suspended trading in the two shells for failure to disclose their control person/promoter. (*Id.* ¶¶ 27–28.)

## 2. Public Sales in the Stock Before Reverse Merger

While most of the shells were not traded publically in over the counter markets before Husain and Jaclin ultimately sold them via reverse merger, New Image, Health Directory, and Movie Trailer were traded publically in over-the-counter markets before their ultimate sale. (*Id.* ¶ 86.) Further, Health Directory and Movie Trailer were ultimately sold via reverse merger utilizing the public marketplace as a vehicle to conduct the transaction.[3] (*Id.* ¶ 109.)

## C. Obstructing Regulatory Oversight

Jaclin advised Husain "in or about 2011" that they should exchange fewer emails to avoid regulatory scrutiny and suggested that Husain create email accounts in the names of the puppet CEOs to conduct all future communications. (*Id.* ¶¶ 143–144.) Jaclin also requested that Husain hire a firm to "scrub" the emails between Husain, Jaclin, and Jaclin's firm from their respective computers. (*Id.* ¶ 146.) Husain evidently followed these directives: he began communicating with Jaclin using new email accounts in the puppet CEOs' names and a "consultant" deleted potentially incriminating emails from the computers at Jaclin's firm. (*Id.* ¶¶ 145, 147.)

In August of 2012, the former puppet CEO of PR Complete informed Husain that she had been subpoenaed by the SEC. (*Id.* ¶ 148.) Husain then told Jaclin about

---

[3] Husain instructed the shareholder nominee to sell his shares on the open market "where the Shell Company Purchasers" then bought them. (*Id.* ¶ 109.)

the subpoena.  (*Id.* ¶ 149.)  Jaclin referred Husain to an attorney for the former puppet CEO and instructed Husain how to coach the former puppet CEO, down to the details of "what she should say and how she should say it."  (*Id.* ¶¶ 150, 154.)  Jaclin also told Husain to have the former puppet CEO testify "consistent with what was falsely disclosed in the registration statements Jaclin's firm had filed on behalf of PR Complete."  (*Id.* ¶ 153.)  Husain again appears to have followed Jaclin's directives; he coached the former puppet CEO "on how to testify" and instructed her to testify falsely without reference to his involvement in PR Complete.  (*Id.* ¶ 151.)

**D. Procedural Posture**

On October 14, 2014, Husain pled guilty to one count of conspiracy to obstruct the proceedings of the SEC, "naming Jaclin as one of two co-conspirators."  (*Id.* ¶ 17.)  On May 12, 2016, the SEC filed this case against Husain and Jaclin seeking disgorgement, penalties, and various forms of injunctive relief related to the scheme.  (ECF No. 1.)  On August 10, 2016, Defendants each filed a motion to dismiss. (ECF Nos. 17, 18.)  The Court granted Husain's motion to dismiss, citing a lack of specificity in the SEC's complaint, and dismissed Jaclin's motion as moot in light of its ruling on Husain's motion.  (ECF No. 31.)

The SEC filed a first amended complaint on November 22, 2016.  (ECF No. 33.)  Husain filed a motion to dismiss the SEC's first amended complaint on December 22, 2016 (ECF No. 36), and Jaclin filed a motion to dismiss one day later (ECF No. 38).  These motions are now fully briefed and ready for decision.  (ECF Nos. 39, 40, 42, 44.) [4]

### III.   LEGAL STANDARD

A court may dismiss a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for lack of a cognizable legal theory or insufficient facts pleaded to support an otherwise cognizable legal theory.  *Balistreri v. Pacifica Police Dep't*, 901 F.2d

---

[4] After considering the papers filed in connection with the motions, the Court deemed the matters appropriate for decision without oral argument.  Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15.

696, 699 (9th Cir. 1990).   To survive a motion to dismiss, a complaint need only satisfy the minimal notice pleading requirements of Rule 8(a)(2)—a short and plain statement of the claim.   *Porter v. Jones*, 319 F.3d 483, 494 (9th Cir. 2003).   The factual "allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).   That is, the complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The determination of whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.   A court is generally limited to the pleadings and must construe all "factual allegations set forth in the complaint . . . as true and . . . in the light most favorable" to the plaintiff.   *Lee v. City of L.A.*, 250 F.3d 668, 688 (9th Cir. 2001).   But a court need not blindly accept conclusory allegations, unwarranted deductions of fact, and unreasonable inferences.   *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

Fraud-based claims are subject to the heightened Rule 9(b) pleading standard. Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud."   Fed. R. Civ. P. 9(b).   The allegations "must set forth more than the neutral facts necessary to identify the transaction.   The plaintiff must set forth what is false or misleading about a statement, and why it is false." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal quotation marks omitted). In essence, the defendant must be able to prepare an adequate answer to the allegations of fraud.   *Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007). Although conclusory allegations of the circumstances constituting the alleged fraud are insufficient, *see Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir. 1989), a party is not required to plead with specificity the alleged wrongdoer's state of mind, *see Concha v. London*, 62 F.3d 1493, 1503 (9th Cir. 1995).

## IV.    DISCUSSION

**A. Motions to Dismiss**

### 1. COUNTS 1 & 2: Sale of Unregistered Securities Under Rule 5(a) and Aiding and Abetting Sale of Unregistered Securities Under Rule 5(a)

Jaclin contests whether there are sufficient allegations in the first amended complaint to render him liable under Rule 5(a) of the Securities and Exchange Act for selling unregistered securities.  (Mot. 20–22; Reply 14–15.)  "In order to establish a Section 5 violation, [plaintiff] must point to evidence that: (1) no registration statement was in effect as to the securities; (2) [defendant] sold or offered to sell the securities; and (3) the sale or offer was made through interstate commerce."  *S.E.C. v. Phan*, 500 F.3d 895, 902 (9th Cir. 2007) (quoting *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 212 (3d Cir. 2006)).

To begin, the first amended complaint does not allege that Jaclin sold any securities; therefore, he can only be held primarily liable for violating Rule 5 on a participant theory.  *S.E.C. v. CMKM Diamonds, Inc.*, 729 F.3d 1248, 1255 (9th Cir. 2013).  The participant theory functions as a modified aiding and abetting rule that allows the SEC to hold a defendant primarily liable for violating Rule 5 even though he never sold securities.  *Id.*  To be found liable under this theory there must be (1) an unregistered, nonexempt sale of securities, (2) in which the defendant was a "significant" participant.  *Id.*  A defendant plays a "significant" role when he is "both a necessary participant and a substantial factor in the sales transaction."  *Id.* (quoting *Phan*, F.3d at 906).  The Court addresses each of the two elements in turn.

The SEC points to three possible sales of unregistered, nonexempt securities that might satisfy the first element of the participant theory: the sale to sham investors, the sale to the shell purchasers, and the shell company purchasers' sale to the public. (Jaclin Opp'n 19–22, ECF No. 39.)  Jaclin argues (1) that the initial sale to the sham investors was registered, (2) that the sales to the shell company purchasers were exempt from registration under Rule 4(2), and (3) that the shell companies' sales were

1  "too attenuated" for participant liability to attach.  (Jaclin Mot. 20–22, ECF No. 38;

2  Jaclin Reply 14–15, ECF No. 44.)

3      The Court agrees with Jaclin that the first transaction with the sham investors

4  was registered.  Few courts have considered whether misstatements in a registration

5  statement may serve to invalidate that statement *ab initio*.  However, to the extent

6  courts have considered this argument, they have expressed skepticism.  *S.E.C. v.*

7  *Caledonian Bank Ltd.*, 145 F. Supp. 3d 290, 305–306 (S.D.N.Y. 2015) (glossing over

8  the SEC's argument that misstatements invalidated registration); *S.E.C. v. Monarch*

9  *Funding Corp.*, No. 85 CIV. 7072 (LBS), 1996 WL 348209, at *11 n.8 (S.D.N.Y.

10 June 24, 1996) (concluding that "nondisclosure" in a registration statement does not

11 give rise to a Rule 5 violation).  Given this skepticism and the SEC's failure to address

12 this theory of liability with any depth in its opposition, the Court finds that the sale to

13 the sham investors does not satisfy the first element of the participant liability test.

14     The Court next considers whether sales of stock to the shell company

15 purchasers can be considered unregistered, nonexempt sales.  Neither side disputes

16 that these sales were unregistered.  The question is whether the stock was exempt

17 from registration.  Jaclin argues that these sales were exempt from the registration

18 under Rule 4(2).[5]  (Jaclin Mot. 21.)  This subsection exempts "transactions by an

19 issuer not involving any public offering."  15 U.S.C. § 77d(a)(2).

20     The SEC argues that although these transactions were between a single issuer[6]

21 and a single sophisticated buyer, they effectively amounted to a public offering

22 because Husain and Jaclin knew that the shell company purchasers were going to sell

23 stock in the shells publicly after acquiring the shells.  (FAC ¶¶ 160, 164, 168; Jaclin

24 Opp'n 23.)  To support this argument, the SEC cites *S.E.C. v. Luna*, No. 2:10-CV-

25 2166-PMP-CWH, 2014 WL 794202 (D. Nev. Feb. 26, 2014).  In *Luna*, the defendants

26 agreed to take a privately held corporation (Axis Technologies Group) public by

27 ─────────────────────────

[5] Jaclin argues that the transactions were exempt "under various provisions of federal securities

28 laws" but only discusses Rule 4(2).  (Jaclin Mot. 21.)

[6] The SEC alleges Husain was the issuer in this transaction.  (FAC ¶ 108.)

merging it with their public shell corporation (Riverside Entertainment Inc.) in exchange for stock. *Id.* at *1–2. Within weeks of acquiring the stock, the defendants began offering it to the public. *Id.* at *3–5. In a later civil enforcement action, the SEC alleged Rule 5 violations based on the defendants' failure to register their acquisition of stock. *Id.* at *5. The defendants argued that the transaction with the corporation was a private transaction and was thus protected under Rule 4(2). *Id.* at *8. The Court found otherwise, noting that because the defendants acquired the stock with an eye towards distributing it to the public, the "process as a whole" effectively constituted a public offering and was thus not exempt from registration under Rule 4(2). *Id.* at *13.

The Court is faced with the reverse situation here, with Husain selling the shell company purchasers securities that he knew they would effectively turn around and sell to the public.[7] (FAC ¶¶ 160, 164, 168.) Husain's position as the seller in the transaction would not seemingly affect the reasoning applied by the *Luna* court. Defendant Jaclin has not offered any rebuttal to the *Luna* court's reasoning even though it is his burden to show that an exemption applies.[8] (Reply 14–15); *see also CMKM Diamonds*, 729 F.3d at 1255 (discussing burden as to exemptions). Finding *Luna*'s reasoning persuasive that transactions such as this should be viewed "as a whole" to "involve[] a public offering" and finding that Jaclin has not met his burden to show that an exemption applies, the Court finds that the sales to the shell company purchasers were not exempt from registration under Rule 4(2), and as a result, the sales satisfy the first element of the participant theory test. *Luna*, 2014 WL 794202, *13–15.

---

[7] The Court notes that the securities were reissued here (upon Jaclin's advice) before they were resold to the public; however, this formality does not render the analogy superfluous. (*See* FAC ¶ 107.)

[8] Neither of the parties has pointed to another case with similar facts to this case besides *Luna*. (Jaclin Opp'n 19–23; Jaclin Reply 14–15.)

This brings the Court to the second element: whether Jaclin was a significant participant in the sale of securities to the shell purchasers.  The Ninth Circuit in *CMKM Diamonds* offered some guidance as to what types of activities might properly be deemed "significant" based on a review of relevant case law.  729 F.3d at 1259. The court reasoned that "devising the scheme" underlying the unregistered sale of securities, finding the "buyers" for the unregistered securities, and structuring the unregistered securities' sales were all forms of "integral[]" involvement that might satisfy the participant theory's second element.  *Id.*  Jaclin's participation in the sales to the shell company purchasers tracks these three categories.  Jaclin devised the "self-filing" method that produced the shells, found six of the seven shell company purchasers, and was at least partially responsible for crafting and processing the deals themselves.  (FAC ¶¶ 29, 99, 102–105, 107.)  Therefore, the Court finds that Jaclin was a "significant" participant in the sale of unregistered, nonexempt securities. Accordingly, the Court **DENIES** Jaclin's motion to dismiss Count 1.

Likewise, the Court finds that Jaclin may, in the alternative, be found secondarily liable for his assistance to Husain based on the allegations in the first amended complaint.  Aiding and abetting requires a (1) a primary violation, (2) actual knowledge of the violation by the aider and abettor, and (3) that the aider and abettor substantially assisted the primary violation.  *S.E.C. v. Espuelas*, 908 F. Supp. 2d 402, 409 (S.D.N.Y. 2012).  As detailed above, the transactions between the Husain and the shell company purchasers were unregistered and nonexempt.  As such, there was a primary violation.

Jaclin also provided substantial assistance.  The substantial assistance element requires the SEC to show that Jaclin "in some sort associated himself with the venture, that he participated in it as in something that he wished to bring about, and that he sought by his action to make it succeed."  *Id.* at 414.  Here, there is no question that Jaclin was substantially involved in the sales to the shell company purchasers that formed the basis of the primary violation.  As discussed above, he found six of the

seven shell company purchasers and helped process the sales.  Further, Jaclin wanted the transactions to succeed; he was paid legal fees upon completion of each sale even before Husain received his own disbursement of funds.  (*See* FAC ¶ 105.)  In sum, the Court finds that Jaclin substantially assisted Husain in the sale of unregistered securities to the shell company purchasers.  Accordingly, the Court also **DENIES** Jaclin's motion to dismiss Count 2.

### 2.  COUNTS 4 & 7: Material Misstatement/Omission[9] Under Rule 17(a)(2) and Rule 10b-5

The Court next turns to the first set of fraud claims.  The parties dispute whether there are sufficient facts alleged in the first amended complaint to establish a cause of action for material misstatement.  Under 10b-5(b) this cause of action requires: (1) the use of interstate commerce, or the mails; (2) to make a material misstatement or omission; (3) with scienter; (4) in connection with the purchase or sale of a security.  17 C.F.R. § 240.10b–5.  Under Rule 17(a)(2), the first two elements remain largely the same, however, only negligence is required and the misstatement must occur in the "offer or sale" of a security.  *S.E.C. v. Trabulse*, 526 F. Supp. 2d 1001, 1004 (N.D. Cal. 2007).  Defendants only contest the materiality of the misstatements and whether the misstatements were "in connection with" the sale of a security or "in the offer or sale of a security."  (Husain Mot. 14–15, ECF No. 36); Jaclin Mot. 10–14.)

It has long been held in the Ninth Circuit that where the misstatement serving as the foundation for liability arises in a publically disseminated document "on which an investor would presumably rely, the 'in connection with' requirement is generally met by proof of the means of dissemination and the materiality of the misrepresentation or

---

[9] When one affirmatively offers incorrect information, he also omits the correct information.  For this reason, and because both forms of deceit are equally actionable under Rules 10b-5(b) and 17(a)(2), the terms can be used interchangeably in this section.

omission."[10]  *S.E.C. v. Retail Pro, Inc.*, 673 F. Supp. 2d 1108, 1132 (S.D. Cal. 2009) (quoting *S.E.C. v. Rana Research, Inc.*, 8 F.3d 1358, 1362 (9th Cir. 1993)).

At issue here is whether the misstatements in various SEC filings regarding the shells' ownership and operation, business plans, and plans to merge with other companies provide a basis for Rule 17(a)(2) and Rule 10b-5(b) liability.  Courts have routinely found that SEC filings, including registration statements and periodic reports, are documents on which an investor would presumably rely.  *Rana Research*, 8 F.3d at 1362; *S.E.C. v. Benson*, 657 F. Supp. 1122, 1131 (S.D.N.Y. 1987) (finding that registration statements and periodic reports are "clearly documents that an investor would rely on in deciding whether to purchase . . . securities"); *Wolfson*, 539 F.3d at 1262–1263 (Forms 10-K and 10-Q are "plainly designed to reach investors" and are "unquestionably material to investors' decisions to transact    . . . stock").  In this case, the alleged misstatements occurred in registration statements and periodic reports (including Forms 10-K and 10-Q) filed with the SEC.  (*See* FAC ¶¶ 13, 65–66, 74, 93, 116–117, 119–120, 122.)  Therefore, the misstatements occurred in documents on which an investor would presumably rely.

The next issue is whether the misstatements and/or omissions were material.  A fact is material when "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Phan*, 500 F.3d at 908 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–232 (1988)).  There is little doubt that a reasonable investor would have wanted to know the true identity of the shell's leader, whether the shell was a viable business operating according to its stated business plan, and whether the shell intended to merge with another corporation.  *San Leandro Emerg. Med. Grp. Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 810 (2d Cir. 1996) ("[M]aterial facts include not only information disclosing the earnings and

---

[10] This sentiment applies equally to Rule 17(a)(2).  *See S.E.C. v. Wolfson*, 539 F.3d 1249, 1263 (10th Cir. 2008).

distributions of a company but also those facts which affect the *probable future of the company* . . ." (emphasis added) (quoting *S.E.C. v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 849 (2d Cir. 1968)). Other than a corporation's financials, its leadership, the nature of its operations, and its plan for the future would seem to be *the most* important pieces of information available to an investor. Therefore, the Court finds that disclosure of the true facts in the SEC filings would have significantly altered the "total mix" of information available to a reasonable investor. *See Phan*, 500 F.3d at 908.

Jaclin argues, albeit somewhat unclearly, that where, as here, the misstatements occur in a publically disseminated document, the "in connection with" or in "the offer or sale" elements necessarily require that investors have at least a theoretical opportunity to view the filings containing the misstatements. (Jaclin Mot. 13.) Here, there was such an opportunity. Despite Jaclin's half-hearted arguments, allegation eighty-six, and the context in which the allegation arises in the first amended complaint, make it clear (especially as clarified by the SEC's opposition) that stock in three of the shells was "traded on the open market" after the dissemination of SEC filings containing the misstatements but before the shells were sold via reverse merger. (*See* FAC ¶ 86.) Thus, the SEC has stated claims under Rule 10b-5(b) and Rule 17(a) on that basis.[11]

Jaclin argues as a last resort that *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011) precludes him from liability under Rule 17(a)(2) because he did not technically "make" misstatements to the SEC. In *Janus*, the Supreme Court held that only those who actually "make" misstatements are liable under Rule 10b-5(b). *Id.* at 147–148. Jaclin, in essence, requests that the Court extend the Supreme Court's holding to misstatements under Rule 17(a)(2). The Court will not do so. The vast majority of courts to consider this argument since *Janus* have

---

[11] Jaclin argues that under the heightened Rule 9(b) pleading standard, the SEC must describe the circumstances underlying these sales. The Court disagrees. To require the SEC to provide the details of all trades at this early stage of the proceeding would not be fair.

declined to extend its holding to Rule 17(a)(2).  *See S.E.C. v. Strebinger*, 114 F. Supp. 3d 1321, 1332 (N.D. Ga. 2015) (providing a detailed explanation of why *Janus* does not apply to 17(a)(2)); *see also S.E.C. v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 796 (11th Cir. 2015); *S.E.C. v. Benger*, 931 F. Supp. 2d 904, 906 (N.D. Ill. 2013) ("[T]he vast majority of courts dealing with the question of whether *Janus* also applies to claims under Section 17 have answered that question with a resounding 'no.'"); *S.E.C. v. Sells*, No. C 11-4941 CW, 2012 WL 3242551, at *7 (N.D. Cal. Aug. 10, 2012); *S.E.C. v. Mercury Interactive, LLC*, No. 5:07-CV-02822-WHA, 2011 WL 5871020, at *3 (N.D. Cal. Nov. 22, 2011) ("This Court agrees . . . that Janus may not be extended to [Rule 17(a) claims].");  *S.E.C. v. Daifotis*, No. C 11-00137 WHA, 2011 WL 3295139, at *6 (N.D. Cal. Aug. 1, 2011).  While the Court notes that Jaclin has cited two cases taking the opposite approach, it would be a mistake to recognize those two cases as anything more than outliers.  *See S.E.C. v. Perry*, No. CV-11-1309 R, 2012 WL 1959566, at *8 (C.D. Cal. May 31, 2012); *S.E.C. v. Kelly*, 817 F. Supp. 2d 340, 345 (S.D.N.Y. 2011); *cf. Benger*, 931 F. Supp. 2d at 906–907 ("*Kelly* is clearly an outlier, even in its own district . . . . and it has not been followed.").  Accordingly, the Court will follow the majority of courts in finding that Jaclin, like Husain, may be held primarily liable under Rule 17(a)(2).  Accordingly, the Court **DENIES** Defendants' motions to dismiss Counts 4 and 7.

### 3.  COUNTS 3 & 6: Scheme Liability Under of Rule 17(a)(1) and 17(a)(3) and Rule 10b-5(a) and (c)

The Court next turns to the scheme liability claims.  The elements for these theories of fraud are the same as those in the misstatement context with "device, scheme[,] or artifice to defraud," replacing misstatement or omission in the respective rule statements of Rule 10b-5 and Rule 17(a).  *S.E.C. v. Zouvas*, No. 316CV0998CABDHB, 2016 WL 6834028, at *5, *10 (S.D. Cal. Nov. 21, 2016).  A scheme typically involves multiple "manipulative" or "deceptive" acts. *S.E.C. v. Zouvas*, No. 316CV0998CABDHB, 2016 WL 6834028, at *5 (S.D. Cal. Nov. 21,

2016) (quoting *Cooper v. Pickett* 137 F.3d 616, 627 (9th Cir. 1997)).   However, misstatements or omissions that form the basis of a misstatement/omission claim may not, by themselves, form the basis of a scheme liability claim in the same case.   *See WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir. 2011); *see also W. Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 845 F.3d 384, 393 (8th Cir. 2016) (finding that although there must be "some conduct other than a misrepresentation to support a scheme liability claim . . . . [courts] do not hold that the alleged scheme can never involve any misrepresentation in order for the scheme liability claim to survive").

This case involves a scheme in the most fundamental sense: a plan with defined, repeated steps (Jaclin's "self-filing" method) executed for a specific purpose (to sell securities to the shell company purchasers via reverse merger for large sums of money by creating public companies that are actually wholly-owned and operated by a single anonymous owner).   Husain's deceitful activities in furtherance of the scheme include, but are not limited to, using sham investors to give the appearance of diversity of ownership, assisting in the preparation of SEC *and* FINRA filings that contained known falsehoods, providing sham investor information to transfer agents and market makers, securing or forging the signature of the sham investors to make it appear to that the sham investors were true shareholders, using email addresses in the puppet CEOs' names to avoid detection, and coaching a former puppet CEO for the purpose of disguising Husain's role in the wrongdoing.   (*See* FAC ¶¶ 160–165.)

Jaclin's deceitful activities in furtherance of the scheme include, but are not limited to, "advising Husain to secretly remain in control of the entire shell making operation, including the puppet CEOs and [the sham investors]" through the process of taking the shells public, advising Husain pay the puppet CEOs a salary to avoid "suspicion," counseling Husain that the sham investors should pay by check to avoid regulatory scrutiny, approving "false and misleading Registration Statements and Periodic Reports for filing" with the SEC, instructing his law firm to provide market

makers with documents from the sham private placements in support of the FINRA Form 211 application, suggesting that Husain make email addresses in the puppet CEOs' names, asking Husain to hire a consultant to delete their email communications, and providing Husain with detailed instructions on how to coach the former puppet CEO to hide Husain's involvement in PR Complete. (*See* FAC ¶¶ 146, 166–169.)[12]

All of these deceitful acts built on each other, and therefore, they were truly in furtherance of the larger scheme.  For instance, the recruitment of the sham shareholders made registration possible with the SEC, the fraudulent registration with the SEC made it possible to obtain FINRA clearance, and the cover-up made it possible to continue executing the scheme from step one with each additional shell.

Finding that each defendant committed numerous deceitful acts (beyond the misstatements or omissions that formed the basis of the Rule 10b-5(b) and Rule 17(a)(2) claims against them) in furtherance of the scheme, the Court turns to whether the deceitful acts were in connection with or in the offer or sale of securities.  Here, the purpose of the deceitful acts was to facilitate the sale of securities to the shell company purchasers via reverse merger.  The misstatements and concealments were necessary to take the shells public and make their securities valuable to those who would eventually purchase them via reverse merger.  This provides the requisite nexus with a sale of securities.

Defendants argue that these transactions with the shell company purchasers do not meet the nexus requirement because the deceptive acts were not inflicted directly on the public and because the deception did not occur in the actual sale itself.  (Jaclin

---

[12] Defendants argue that the SEC has not done enough to separate out and discretely identify the conduct of each Defendant since the Court dismissed the initial complaint.  (Husain Mot. 15–16; Jaclin Mot. 9–10.)  The Court strongly disagrees.  The SEC has added sections and allegations detailing the specific involvement of each Defendant in the scheme.  The Court will not dismiss the first amended complaint on Rule 9(b) grounds.

Mot. 10–13, Jaclin Opp'n 7–8.)   The Court agrees with the SEC that Defendants' conception of securities fraud is too narrow.

The Supreme Court has stated in reference to Rule 17(a)(1) that "the statutory language does not require that the victim of the fraud be an investor- only that the fraud occur 'in' an offer or sale."  This is also the case for Rule 10(b).  *A.T. Brod & Co. v. Perlow*, 375 F.2d 393, 396 (2d Cir. 1967) ("Neither 10(b) nor Rule 10b-5, it appears, speaks in terms of limiting the nature of the violation to one involving fraud of 'investors'; nor is there any justification for reading such an additional requirement into the Act."); *see also Rana Research*, 8 F.3d at 1362 (finding that the "in connection with" requirement can be met where the fraud "somehow touches upon" "*any* securities transaction" (emphasis added and internal quotations omitted)); *Graham v. S.E.C.*, 222 F.3d 994, 1002 (D.C. Cir. 2000) (finding that the fraud need not be directed at investors).

As the SEC points out, there are examples in which courts have found the potential for violations of Rule 17(a) and Rule 10(b) where the fraud occurred in the process of selling securities rather than in the actual sale of the securities themselves. For instance, in *S.E.C. v. Czarnik*, No. 10 CIV. 745 PKC, 2010 WL 4860678, at *9 (S.D.N.Y. Nov. 29, 2010), a district court declined to dismiss fraud claims against a defendant who repeatedly misled a transfer agent.

Decisions like *Czarnik* should not be surprising in light of the larger goals of securities regulation.  As the Supreme Court stated, while "[p]revention of frauds against investors was surely a key part of the [Securities] Act, . . . so was the effort to achieve a high standard of business ethics . . . *in every facet of the securities industry*." *U.S. v. Naftalin*, 441 U.S. 768, 769 (1979) (emphasis in original); *see also A.T. Brod*, 375 F.2d at 396 (finding that fraud-based securities regulations were "designed to protect both investors *and* the public interest." (emphasis added)).   Indeed, the language used in relevant case law suggests that the fraud provisions were meant to be broad and flexible so as to root out fraud wherever it exists and whatever form it

takes. *U.S. v. Charnay*, 537 F.2d 341, 349 (9th Cir. 1976) ("'[The securities fraud provisions] are not intended as a specification of particular acts or practices that constitute 'manipulative or deceptive devices or contrivances,' but are instead designed to encompass the infinite variety of devices that are alien to the 'climate of fair dealing."); *SEC v. Zandford,* 535 U.S. 813, 819 (2002) (The anti-fraud provisions "should be construed not technically and restrictively, but flexibly to effectuate [their] remedial purposes.")

This scheme clearly undermines the integrity of the "securities industry" as a whole and the "public interest." *Naftalin*, 441 U.S. at 769; *A.T. Brod*, 375 F.2d at 396. Whether it be misleading the SEC, FINRA, market makers, or transfer agents, this type of purposeful, repeated deceit wreaks havoc on the existing regulatory framework and negatively informs the public's overall perception of the securities industry, making them less likely to invest. For these reasons, the Court finds that the SEC has sufficiently stated scheme claims under the fraud provisions. Accordingly, the Court **DENIES** Defendants' motions to dismiss Counts 3 and 6.

### 4. COUNTS 5 & 8: Aiding Abetting Fraud of Rule 17(a) and Rule 10b-5

Defendants' next move to dismiss the aiding and abetting fraud charges, arguing that because there were no primary violations of Rule 17(a) and Rule 10b-5, the counts for secondary violations necessarily fail. (Husain Mot. 14–15; Jaclin Mot. 17–18.) Defendants do not put forth any other arguments specific to the secondary violation counts. (Husain Mot. 14–15; Jaclin Mot. 17–18.) As the primary violation counts survive the pending motions to dismiss, so too do the secondary violations counts. The Court **DENIES** Defendants' motions to dismiss Counts 5 and 8.

### 5. COUNT 9: Aiding and Abetting Registration Violations under Section 15(d) and Rules 12b-20, 15d-1, and 15d-13

Finally, Defendant Jaclin moves to dismiss the Rule 15(d) aiding and abetting charge related to the shells' reporting violations. (Jaclin Mot. 19–20.) Rule 15(d) provides that issuers "that have filed registration statements with the SEC shall file

with the Commission, in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, such supplementary and periodic information, documents, and reports as may be required by other provisions of the securities laws and SEC regulations." *S.E.C. v. Fehn*, 97 F.3d 1276, 1289 (9th Cir. 1996) (citing 15 U.S.C. § 78o(d)).  Case law seems to suggest that material misstatements or omissions in periodic reports are required for this cause of action.  (*Id.* at 1290.)

Jaclin's sole contention is that the misstatements or omissions contained in the periodic reports were not material.  (Jaclin Mot. 19–20.)  The Court already conducted a materiality analysis in connection with Counts 4 and 7 and found that the misstatements and omissions in the SEC filings (including the periodic reports) were material.  Neither party, nor the Court's own research, provides any reason to believe that the materiality test applied in the fraud context is substantively different from the materiality test applied in the Rule 15(d) context.  Therefore, the Court finds that the misstatements in the periodic reports were material and **DENIES** Jaclin's motion to dismiss Count 9.

## B. Motions to Strike

Federal Rule of Civil Procedure 12(f) permits a court to "strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter."  Motions to strike are "disfavored" and "should not be granted unless the matter to be stricken clearly could have no possible bearing on the subject of the litigation."  *Rees v. PNC Bank, N.A.,* 2015 WL 1548952, at *3 (N.D. Cal. Apr. 7, 2015) (citation and quotation marks omitted).  In ruling on a 12(f) motion, the Court must view the pleadings in the light most favorable to the nonmoving party.  *Platte Anchor Bolt, Inc. v. IHI, Inc.,* 352 F. Supp. 2d 1048, 1057 (N.D. Cal. 2004).  Here, Husain and Jaclin move to strike certain portions of the prayer for relief and Husain moves to strike all references to subsequent negative conduct of the shell company purchasers after their purchase of the shells via reverse merger.  (Husain Mot. 16–19, Jaclin Mot. 23–24.)

**1.  Statute of Limitations**

The statute of limitations applicable to civil enforcement actions is described in 28 U.S.C. § 2462: "an action . . . for the enforcement of any civil fine, penalty, or forfeiture . . . shall not be entertained unless commenced within five years from the date when the claim first accrued."  Defendants argue that disgorgement and/or penalties for any conduct occurring before March 1, 2011, is barred by section 2462. (Husain Mot. 17–18; Jaclin 23–24.)

**i.  Disgorgement**

In seeking to avoid disgorgement for activities occurring before March 1, 2011, Defendants rely solely on *S.E.C. v. Graham*, 823 F.3d 1357, 1363 (11th Cir. 2016) which upheld a district court's ruling that disgorgement was equivalent to forfeiture and therefore subject to section 2462.  (Husain Mot. 17–18; Jaclin Mot. 23–24.) Every court to consider the Eleventh Circuit's disgorgement holding has declined to follow it.  *S.E.C. v. Kokesh*, 834 F.3d 1158, 1166–67 (10th Cir. 2016); *S.E.C. v. Ahmed*, No. 3:15CV675 (JBA), 2016 WL 7197359, at *7 (D. Conn. Dec. 8, 2016); *S.E.C. v. Straub*, No. 11 CIV. 9645 (RJS), 2016 WL 5793398, at *15 (S.D.N.Y. Sept. 30, 2016).  Though it appears that district courts in the Ninth Circuit have yet to explicitly consider the Eleventh Circuit's holding, they have reached the same conclusion as those that have—disgorgement is not subject to section 2462.  *S.E.C. v. Bardman*, No. 16-CV-02023-JST, 2016 WL 6276995, at *14 (N.D. Cal. Oct. 27, 2016); *S.E.C. v. Stoecklien*, No. 15CV0532 JAH WVG, 2015 WL 6455602, at *3 (S.D. Cal. Oct. 26, 2015).  The Court will not follow *Graham* and **DENIES** Defendants' motion to strike any portion of the SEC's request for disgorgement from the prayer for relief.

**ii.  Penalties**

Unlike disgorgement, penalties are indisputably subject to section 2462.  *See Bardman*, 2016 WL 6276995, at *13 (citing *S.E.C. v. Leslie*, No. C 07–3444, 2010 WL 2991038, at *35 (N.D. Cal. Jul. 29, 2010)).  Therefore, to obtain penalties for

conduct occurring before March 1, 2011, the SEC must invoke a tolling mechanism. Here, the SEC argues that the continuing violation doctrine applies as Defendants are charged with a scheme that spanned from 2006 to 2013.  (FAC ¶ 6; Husain Opp'n 20–21, ECF No. 40.)

Defendants put forth a number of unpublished district court cases from around the United States questioning the continuing violation doctrine's applicability in the securities context.  *See*, *e.g.*, *S.E.C. v. Jones*, No. 05 CIV. 7044(RCC), 2006 WL 1084276, at *4 (S.D.N.Y. Apr. 25, 2006).  However, there are perhaps an equal number of unpublished district court cases from around the United States taking the opposite position.  *See*, *e.g.*, *S.E.C. v. Kingdom Legacy Gen. Partner, LLC*, No. 216CV441FTM38MRM, 2017 WL 417093, at *12 (M.D. Fla. Jan. 31, 2017).

District courts in the Ninth Circuit have suggested that the continuing violation doctrine does apply.  *Bardman*, 2016 WL 6276995, at *13; *S.E.C. v. Des Champs*, No. 2:08–CV–01279–KJD–GWF, 2009 WL 3068258, at *2 (D. Nev. Sep. 21, 2009); *S.E.C. v. Richie*, No. EDCV 06–63–VAP SGLX, 2008 WL 2938678, at *11–12 (C.D. Cal. May 9, 2008).  Further, these courts have indicated that the fact-intensive nature of the inquiry means that it should not be accessed at the motion to dismiss stage and should instead be reserved for summary judgment.  *Bardman*, 2016 WL 6276995, at *13–14; *Des Champs*, 2009 WL 3068258, at *2; *Richie*, 2008 WL 2938678, at *11–12.  In light of the other Ninth Circuit district courts' rulings on this issue, the scheme allegations present in the first amended complaint, and the strong preference against motions to strike, the Court **DENIES** Defendants' motion to strike any portion of the SEC's request for penalties.

### 2. Allegations Concerning the Shell Purchasers' Misconduct

Husain argues that allegations of the shell company purchasers' misconduct subsequent to the sales should be stricken from the first amended complaint because they "artificially connect Mr. Husain to actions that have nothing to do with him." (Husain Mot. 18–19.)  The SEC argues that the shell company purchasers' subsequent

misconduct is tied to the cover-up potion of the scheme and tends to show that the shell company purchasers did in fact engage in sales of stock, which is relevant to whether they purchased with an intent to distribute as discussed in the Rule 5 context. (Husain Opp'n 21–24.)  The Court agrees with Defendants; the SEC's arguments only draw a vague connection between the shell company purchasers' subsequent misconduct and issues relevant to this case.  However, the Court will not dismiss the allegations at this early stage of the litigation.  *Rees*, 2015 WL 1548952, at *3 (motions to strike "should not be granted unless the matter to be stricken clearly could have *no possible bearing* on the subject of the litigation." (emphasis added)). Accordingly, the Court **DENIES** Husain's motion to strike allegations relating to the subsequent misconduct of the shell company purchasers.

## V.    CONCLUSION

Based on the foregoing, the Court **DENIES** Defendants' motions to dismiss in their entirety.  (ECF Nos. 36, 38.)  The Court also **DENIES** Defendants' motions to strike in their entirety.[13]

**IT IS SO ORDERED.**

March 1, 2017

_____
**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**

---

[13] The Court has not considered the documents contained in the SEC's request for judicial notice in connection with the adjudication of these motions and takes no position as to their admissibility. (*See* ECF Nos. 41, 43.)

24