1   AMY JANE LONGO, Cal. Bar No. 198304
    E-mail: LongoA@sec.gov
2   ROBERTO A. TERCERO, Cal. Bar No. 143760
    E-mail: TerceroR@sec.gov
3
    Attorney for Plaintiff
4   Securities and Exchange Commission
    Michele Wein Layne, Regional Director
5   Alka Patel, Associate Regional Director
    Amy Jane Longo, Regional Trial Counsel
6   444 S. Flower Street, Suite 900
    Los Angeles, California 90071
7   Telephone: (323) 965-3998
    Facsimile: (213) 443-1904
8

9

10              UNITED STATES DISTRICT COURT

11             CENTRAL DISTRICT OF CALIFORNIA

12                    WESTERN DIVISION

13

14   SECURITIES AND EXCHANGE          Case No. 2:16-cv-03250-ODW (Ex)
     COMMISSION,
15                                    **STATEMENT OF**
               Plaintiff,            **UNCONTROVERTED FACTS AND**
16                                   **CONCLUSIONS OF LAW IN**
       IMRAN HUSAIN and GREGG        **SUPPORT OF MOTION FOR**
17     EVAN JACLIN,                  **SUMMARY JUDGMENT AGAINST**
                                     **DEFENDANT IMRAN HUSAIN**
18             Defendants.
                                     Date:      June 15, 2020
19                                   Time:      1:30 p.m.
                                     Ctrm:      5D
20                                   Judge:     Hon. Otis D. Wright, II

21                                   Pretrial Conference:  08/24/2020
                                     Trial Date:           09/22/2020
22

23

24

25

26

27

28

Pursuant to Rule 56-1 of the Local Rules for the United States District Court, Central District of California, Plaintiff Securities and Exchange Commission ("SEC") submits this Statement of Uncontroverted Facts and Conclusions of Law, setting forth the facts as to which there is no genuine issue. In the left column are the statements of uncontroverted fact. In the right column are citations to the evidence, found in the accompanying declarations, supporting the facts.

## I.   Husain's Control of the Shell Companies

| Uncontested Fact | Evidence |
|---|---|
| 1.      From approximately 2008 to at least 2012, Husain controlled various publicly traded shell corporations that he later sold to buyers who sought to trade the shell corporations' stock publicly. | Dkt. No. 92 ("Husain Amended Answer"), ¶¶ 4-6; <br><br>*United States of America vs. Imran Husain*, Case No. 3:14-cr-149-RS, Plea Agreement, Dkt. No. 24, attached as Exhibit 1 to the Declaration of Amy Jane Longo ("Longo Decl.") *filed concurrently herewith* ("Husain Criminal Plea"), ¶ 2; <br><br>Longo Decl. ¶ 2. |
| 2.      Husain created and controlled the following nine shell companies:  (1) New Image Concepts, Inc. ("New Image"); (2) PR Complete Holdings, Inc. ("PR Complete"); (3) Ciglarette Inc. ("Ciglarette"); (4) Rapid Holdings, Inc. ("Rapid Holdings"); (5) Resume in Minutes, Inc. ("Resume in Minutes"); (6) Movie Trailer Galaxy ("Movie Trailer"); (7) Health Directory, Inc. ("Health Directory"); (8) Comp. Services, Inc. ("Comp. Services"); and (9) Counseling International, Inc. ("Counseling International") (collectively, the "Shell Companies"). | Husain Criminal Plea, ¶ 2; <br><br>Longo Decl. ¶¶ 3, 75; <br><br>Ex. 2, Defendant Husain's Response to Plaintiff SEC's First Set of Requests for Admission ("RFA Response") No. 1; <br><br>Ex. 68, SEC's First Set of Requests for Admission ("RFA") No. 1. <br><br>_ <br><br>Dkt. No. 52 ("Husain Original Answer"), ¶ 19; <br><br>Husain Amended Answer, ¶ 19. |

| Uncontested Fact | Evidence |
|---|---|
| 3.     The "shell factory scheme followed a routine pattern, which Jaclin devised and taught to Husain. First, Husain created a written 'business plan' for a new company to be created and convinced a friend, friend of a friend, relative or acquaintance of his to be the CEO but in name only. Husain would actually control the company and the CEO's activities, so the CEO was no more than Husain's 'puppet.' Husain then instructed the puppet CEO to engage Jaclin's law firm to incorporate the company, prepare the documents for a private offering of the company's shares of stock, take the company public, and obtain clearance for the company's stock to trade publicly." | Husain Amended Answer, ¶ 7. |
| 4.     The "scheme was carried out by Husain, an undisclosed control person and promoter [and Jaclin]. In his plea agreement [in the related criminal action], Husain admits how he and Jaclin carried out their shell factory enterprise." | Husain Amended Answer, ¶ 5. |
| 5.     Husain hired Jaclin "to advise him regarding the formation [of shell corporations] and to help prepare various corporate documents and SEC documents." | Husain Original Answer, ¶ 6; <br><br> *see also* Husain Criminal Plea, ¶ 2. |
| 6.     Husain understood that a shell corporation "is a company that serves as a vehicle for a business transaction without itself having any significant assets or operations." | Husain Criminal Plea, ¶ 2 |

| Uncontested Fact | Evidence |
|---|---|
| 7.     Husain recruited "'nominees' to serve as CEOs [the "Puppet CEOs"] and as shareholders of these companies." | Husain Criminal Plea, ¶ 2. |
| 8.     Husain directed the Puppet CEOs to form shell corporations and "controlled the actions taken by the Puppet CEOs." | Husain Criminal Plea, ¶ 2 |
| 9.     Husain "engaged the Puppet CEOs to perform services as officers of [the Shell Companies] and [] provided direction to the CEOs with respect to certain actions." | RFA Response Nos. 2, 5; RFA Nos. 2, 5; *see also* Husain Criminal Plea, ¶ 2. |
| 10.     Husain understood that the Puppet CEOs' names would appear on corporate documents and bank accounts as the company CEO and officers but they would not "exercise actual control over the companies." | Husain Criminal Plea, ¶ 2; *see also* Husain Original Answer, ¶¶ 42, 51; Husain Amended Answer, ¶ 51. |
| 11.     Husain agreed with Jaclin, for all of the Shell Companies, to be "considered as a 'consultant only, even though he exercised control over them." | Husain Criminal Plea, ¶ 2; RFA Response No. 3; RFA No. 3. |
| 12.     The puppet CEOs were "typically friends and family members" of Husain. | Husain Criminal Plea, ¶ 2; Husain Original Answer, ¶ 42. |
| 13.     Husain "typically selected a business plan for the shell company that related to the puppet CEO's own background." | Husain Amended Answer, ¶ 44. |
| 14.     Jaclin advised Husain that the puppet CEOs "should receive some salary to avoid raising suspicions," and | Husain Amended Answer, ¶¶ 45-46. |

| Uncontested Fact | Evidence |
|---|---|
| Husain "promised potential puppet CEOs a salary of between $500 and $700 per month." | |
| 15.    Husain introduced the puppet CEOs to Jaclin and the puppet CEOs retained Jaclin's firm to provide legal services to the shell corporations. | Husain Amended Answer, ¶ 47. |
| 16.    Husain and Jaclin directed the Puppet CEOs on all the actions they needed to take in order to take the company public and eventually sell it. | Husain Criminal Plea, ¶ 2; Husain Original Answer, ¶ 43. Husain Amended Answer, ¶ 49. |
| 17.    Husain "had the final authority on all matters involving" the Shell Companies. | Husain Criminal Plea, ¶ 2; Husain Answer ¶ 49. |
| 18.    Husain "corresponded with Jaclin and his firm regarding important decisions involving" the Shell Companies, but the Puppet CEOs "generally did not." | Husain Criminal Plea, ¶ 2; Husain Amended Answer, ¶ 50; RFA Response No. 6; RFA No. 6. |

## II.    The Sham Private Placements

| Uncontested Fact | Evidence |
|---|---|
| 19.    Husain "assisted in organizing private placements" for the shell companies. | Husain Original Answer, ¶ 8; Longo Decl. Ex. 3   [Email from Husain, SEC-FBI-E-0003720-21]; *Id.* ¶¶ 4, 73. |
| 20.    Husain paid people to help recruit shareholders for the Shell Companies. | Husain Criminal Plea, ¶ 2; RFA Response No. 7; RFA No. 7; Husain Amended Answer, ¶ 8. |

4

| | |
|---|---|
| 21. Husain assisted some of the shareholders with financing to buy their stock subscription. | Husain Amended Answer, ¶ 55. |
| 22. Jaclin "advised Husain that the [nominee shareholders] should submit personal or cashier's checks, rather than money orders, to avoid raising regulators' suspicion." | Husain Amended Answer, ¶ 58; Longo Decl. Ex. 4 [4/27/10 Emails between Husain and Daniel Brandt re: Call, SEC-FBI-E-0004342]; *Id.* ¶¶ 5, 73. |
| 23. Husain knew that "the Straw Shareholders generally were not using their own money to purchase the shares" of the Shell Companies. | Husain Amended Answer, ¶ 63. |
| 24. Nominee shareholders submitted blank stock sale agreements at the same time they purchased shares to ensure the buyer of the company could control the free trading shares of the company. | Longo Decl. Ex. 5 [2/3/10 Emails between Husain and Reza Rahman re: Shareholders, SEC-FBI-E-0003251-52]; Ex. 6 [Testimony Ex. 197, 2/17/10 Email from Belen Flores to Daniel Brandt, cc: Husain re: Share holder list for Ciglarette and Resume]; Ex. 67, [SEC Investigative Testimony of Daniel Brandt, 1/28/15 ("Brandt") at 64:17-67:12]; *Id.* ¶¶ 5, 74. |
| 25. Jaclin maintained possession of the stock certificates issued to nominee shareholders. | Husain Amended Answer, ¶ 61. |

## III. The Shell Companies' False and Misleading Registration Statements

| Uncontested Fact | Evidence |
|---|---|
| 26. Collectively, between 2008 and 2013, the Shell Companies filed with the SEC over fifty registration statements or amendments thereto on Form S-1. | Husain Amended Answer, ¶¶ 20-27. |

| Uncontested Fact | Evidence |
|---|---|
| 27.    On March 18, 2008, New Image filed a Form S-1 registration statement, in connection with an initial public offering of 997,855 shares of common stock.  The registration statement was filed on March 18, 2008; was amended on April 1, 2008; became effective on April 4, 2008; and was amended post-registration on September 23, 2009, effective September 29, 2009. | Husain Amended Answer, ¶ 20(a). |
| 28.    On November 7, 2008, PR Complete filed a Form S-1 registration statement in connection with an initial public offering of 914,000 shares of common stock.  The registration statement was filed on November 7, 2008; was amended on December 15, 2008 and January 5, 2009; became effective on January 16, 2009; and was amended post-registration on September 23, 2009, effective September 24, 2009. | Husain Amended Answer, ¶ 21(a). |
| 29.    On April 28, 2010, Ciglarette filed a Form S-1 registration statement in connection with an initial public offering of 296,703 shares of common stock.  The registration statement was filed on April 28, 2010; was amended on May 18, 2010, June 9, 2010, June 15, 2010, June 22, 2010, and June 24, 2010; and became effective on June 24, 2010. | Husain Amended Answer, ¶ 22(a). |
| 30.    On July 2, 2010, Rapid Holdings filed a Form S-1 registration statement in connection with an initial public offering of 818,000 shares of common stock.  The registration statement was | Husain Amended Answer, ¶ 23(a). |

| Uncontested Fact | Evidence |
|---|---|
| filed on July 2, 2010; was amended on August 9, 2010, August 19, 2010, August 27, 2010, September 2, 2010, September 10, 2010, September 23, 2010, October 1, 2010, and October 5, 2010; and became effective on October 8, 2010. | |
| 31.    On May 11, 2010, Resume in Minutes filed a Form S-1 registration statement in connection with an initial public offering of 267,400 shares of common stock.  The registration statement was filed on May 11, 2010; was amended on June 23, 2010, July 15, 2010, July 20, 2010, and July 23, 2010; and became effective on July 27, 2010. | Husain Amended Answer, ¶ 24(a). |
| 32.    On October 15, 2010, Movie Trailer filed a Form S-1 registration statement in connection with an initial public offering of 280,985 shares of common stock.  The registration statement was filed on October 15, 2010; was amended on December 16, 2010, January 19, 2011, February 9, 2011, March 2, 2011, and March 18, 2011; became effective March 25, 2011; and was amended post-registration on September 4, 2012, effective September 12, 2012. | Husain Amended Answer, ¶ 25(a). |
| 33.    On May 27, 2011, Health Directory filed a Form S-1 registration statement in connection with an initial public offering of 759,400 shares of common stock.  The registration statement was filed May 27, 2011; was amended July 14, 2011, August 12, | Husain Amended Answer, ¶ 26(a). |

| Uncontested Fact | Evidence |
|---|---|
| 2011, September 21, 2011, and October 4, 2011; and became effective on October 19, 2011. | |
| 34.   On December 20, 2011, Comp Services filed a Form S-1 registration statement in connection with an initial public offering of 739,000 shares of common stock.  The registration statement was filed December 20, 2011; was amended January 27, 2010, February 22, 2012, March 14, 2012, April 10, 2012, April 23, 2012, April 26, 2012, and April 30, 2012; became effective on May 4, 2012; and was amended post registration on October 17, 2013, November 27, 2013, and December 18, 2013. | Husain Amended Answer, ¶ 27(a). |
| 35.   On August 8, 2012, Counseling International filed a Form S-1 registration statement in connection with an initial public offering of 763,400 shares of common stock.  The registration statement was filed August 8, 2012; and was amended September 25, 2012, November 19, 2012, December 19, 2012, and January 9, 2013. | Husain Amended Answer, ¶ 28(a). |
| 36.   Husain helped prepare the Shell Companies' SEC filings. | Husain Original Answer, ¶ 68. |
| 37.   Husain "reviewed and approved documents and served as the main point of contact for the shell companies with Jaclin's law firm and the auditor throughout the registration process." | Husain Amended Answer, ¶ 69. |

| Uncontested Fact | Evidence |
|---|---|
| 38.     Jaclin instructed his associates that Husain had the authority to approve documents for filing with the SEC. | Husain Amended Answer, ¶ 70. |
| 39.     Jaclin's associates emailed each draft registration statement, including any changes or edits, to Jaclin for his approval. | Husain Amended Answer, ¶ 71. |
| 40.     The draft registration statement was then sent to Husain and the shell company's outside auditor for review, before being filed with the SEC. | Husain Amended Answer, ¶ 72. |
| 41.     Husain caused the registration statements to be filed with the SEC on behalf of the Shell Companies. | Husain Original Answer, ¶ 66. |
| 42.     Husain and Jaclin filed the Shell Companies' registration statements. | Husain Amended Answer, ¶ 65. |
| 43.     Husain "asked [] Jaclin to prepare and cause to be filed Form S-1 statements without disclosing that he was a control person while actually exercising substantial control over the companies." | Husain Amended Answer, ¶ 9. |
| 44.     The "names of the CEOs and shareholders appeared on all the corporate documents and SEC filings…but [Husain's] name never did, even though [Husain] had the final authority on all matters involving the companies." | Husain Criminal Plea, ¶ 2. |
| 45.     The Shell Companies' registration statements on Form S-1 and the amendments thereto were misleading in that they contained "no | RFA Response Nos. 9-10;<br>RFA Nos. 9-10;<br>Husain Criminal Plea, ¶ 2. |

| Uncontested Fact | Evidence |
|---|---|
| disclosure of Husain's role as a controlling person" of the Shell Companies. | |
| 46.    The Registration Statements "'made no mention of Husain's identify and role as the control person' over each company." | Husain Amended Answer, ¶ 74(a). |
| 47.    The "Registration Statements claimed that the nominee CEO was the officer, director, and employee of the [Shell Companies] and did not mention [Husain's] identity or role as the control person and promoter of the [Shell Company], or that the nominee CEO was the CEO in name only." | Husain Original Answer, ¶ 74(a). |
| 48.    The Shell Companies registration statements listed the Puppet CEOs as the executive officers, and did not disclose Husain's control of the Shell Companies. | *E.g.*, Longo Decl. Ex. 7 [Testimony Ex. 145:  Health Directory Form S-1 at SEC_LA-4240_001581-82 (list of selling shareholders, shows the private placement purchasers and does not include Husain); SEC_LA-4240_001603 (Humaira Haider listed as sole control person and beneficial owner of more than 5% of stock); SEC_LA-4240_001606 (states that none of the shareholders are affiliated with the promoters); SEC_LA-4240_001609 (signature on S-1 of Humaira Haider as president); <br><br> *see also* Ex. 8 [Testimony Ex. 147: Health Directory Form S-1/A #4 at SEC_LA-4240_001639 (stating that company is proceeding with stated business plan); SEC_LA-4240_001646 (selling shareholders are selling shares for their own accounts); <br><br> Ex. 9 [Testimony Ex. 105:  Movie Trailer Form S-1 at SEC_LA-4240_001000 (stating that selling shareholders are selling shares offered in prospectus and that company will not receive any of the proceeds); SEC_LA-4240_001002 (company is |

| Uncontested Fact | Evidence |
|---|---|
| | proceeding with business plan); SEC_LA-4240_001010 (list of straw shareholders); SEC_LA-4240_001057 (signature of puppet CEO); *Id.* ¶¶ 8-10. |
| 49.   Husain "knew that the Registration Statements failed to disclose Husain's true role as a 'controlling person...'" | Husain Amended Answer, ¶ 75. |
| 50.   The Shell Companies' Forms S-1 and the amendments did not disclose how the Straw Shareholders were recruited. | RFA Response No. 12; RFA No. 12. |
| 51.   Husain kept his name off the registration statements because Jaclin told him the SEC "would be unlikely to approve the registration statements if" Husain's name was "disclosed as an officer control person or primary shareholder on all of these companies." | Husain Criminal Plea, ¶ 2. |
| 52.   Husain understood it would "look suspicious to the SEC if [he] were listed as a control person for a series of shell companies." | Husain Criminal Plea, ¶ 2. |
| 53.   Husain was "afraid of what would happen to [him] if the SEC knew about his involvement with the shell companies…" | Husain Criminal Plea, ¶ 2. |
| 54.   The common stock of Comp Services "was quoted on the OTC Link under the symbol 'CMPS.' On April 23, 2014, while a post-effective amendment was pending, the SEC issued a stop order suspending the effectiveness of its registration statement, citing the company's failure | Husain Amended Answer, ¶ 27(c). |

| Uncontested Fact | Evidence |
|---|---|
| to disclose its control person/promoter. *In re the Registration Statement of Comp Services, Inc.*, Rel. No. 33-9577 (Apr. 23, 2014). | |
| 55.   On August 22, 2013, the SEC issued a stop order suspending the effectiveness of Counseling International's registration statement, citing the company's failure to disclose its control person/promoter. *In re the Registration Statement of Counseling International,* Rel. No. 33-9444 (Aug. 22, 2013). | Husain Amended Answer, ¶ 28(b). |

## IV.    The Shell Companies' False and Misleading Forms 211

| Uncontested Fact | Evidence |
|---|---|
| 56.   Husain selected the transfer agent for each Shell Company. | Husain Amended Answer, ¶ 77. |
| 57.   Once the Shell Company's registration statement was declared effective, Jaclin sent the transfer agent his firm's Form S-1 opinion letter. | Husain Amended Answer, ¶ 78. |
| 58.   Husain and Jaclin "worked with a market maker to file a FINRA Form 211" for each Shell Company. | Husain Amended Answer, ¶ 79. |
| 59.   As a condition of the market maker filing the Form 211, the Shell Company agreed to provide the market maker with accurate information about the company, including as to control persons, officers and directors of the company. | *E.g.* Longo Decl. Ex. 25 [5/12/14 Testimony of Paul Eric Flesche of Glendale Securities ("Flesche"), 14:16-16:22, 36:3-41:4]. |
| 60.   The Shell Companies' FINRA Form 211s and the associated filing | *E.g.,* Longo Decl. Ex. 44 [Testimony Ex. 78:  Health Directory FINRA Form 211; |

| Uncontested Fact | Evidence |
|---|---|
| agreement, information statement, and officer and director questionnaire, listed the Puppet CEOs as the executive officers, and not disclose Husain's control of the companies. | Ex. 45 [SEC-Glendale-E-0016385: Health Directory Form 211 Filing Agreement (puppet CEO certifies that the information supplied to Glendale Securities is complete and accurate); Ex. 46 [ SEC-Glendale-E-0016393-98: Health Directory Form 211 Information Statement (at pp.94-96, listing puppet CEO and not Husain as sole control person); Ex. 47 [SEC Glendale-E-0006687-95: Health Directory Form 211 Officer and Director Questionnaire (at p.95, puppet CEO certifying accurateness of information supplied to market maker)]; Longo Decl. ¶¶ 50-53, 58; Ex. 52 [certificate of production]. |
| 61.    The Shell Companies' Form 211s "could be construed as misleading due to the fact that the documents failed to disclose 'Husain's identity and [true role]' as a control person." | Husain Amended Answer, ¶ 81. |
| 62.    The market makers received copies of the subscription agreements and investor checks from the private placement from Jaclin's firm. | Husain Amended Answer, ¶ 83. |
| 63.    The market makers reviewed copies of the Form S-1 registration statements. | *E.g.* Longo Decl. Ex. 25 [Flesche 73:21-74:24]. |
| 64.    Husain "worked with the market maker and its affiliated transfer agent to obtain DTC eligibility for each shell company's stock, which allows for electronic settlement of the stock and therefore at a lower cost, thereby enhancing the value of the shell company for sale." | Husain Amended Answer, ¶ 85; Longo Decl. Ex. 25 [Flesche 32:9-18, 34:10-35:1]. |

| Uncontested Fact | Evidence |
|---|---|
| 65.    The Shell Companies' Forms 211 applications did not disclose Husain's control of the Shell Companies. | RFA Response No. 14.<br><br>RFA No. 14. |
| 66.    Pre-merger trades occurred in the stock of Health Directory and Movie Trailer. | Husain Amended Answer, ¶ 86 (re: Health Directory and Movie Trailer). |
| 67.    Pre-merger trading also occurred in New Image, in in July 2008 (prior to its sale in December 2009). | Longo Decl. Ex. 26 [SEC-Glendale-E-0011741-45 at 43: Glendale Securities July 2008 account statement for Lisan Rahman reflecting 7/10/08 trade in stock of New Image];<br><br>*Id.* ¶¶ 27, 58; Ex. 52 [Certificate of Production];<br><br>Husain Amended Answer, ¶ 20(c) (admitted, New Image was sold in a reverse merger in December 2009). |
| 68.    The pre-merger trading in Health Directory occurred in February 2012 (prior to its sale in July 2012). | Longo Decl. Ex. 48 [SEC-Glendale-E-0011399-04 at 02: Glendale Securities February 2012 account statement for Lisan Rahman reflecting 2/17/12 trade in stock of Health Directory];<br><br>*Id.* ¶¶ 54, 58; Ex. 52 [Certificate of Production];<br><br>Husain Amended Answer, ¶ 26(c) (admitted, Health Directory was sold in a reverse merger in July 2012). |
| 69.    The pre-merger trading in Movie Trailer occurred in July and August 2012 (prior to its sale in September 2012). | Longo Decl. Ex. 29 [SEC-Glendale-E-0010265-69 at 67: Glendale Securities account statement for Rowland Day reflecting July 2012 trade in stock of Movie Trailer];<br><br>Ex. 30 [Glendale Securities account statement at p.2 for Lisan Rahman reflecting August 2012 trade in stock of Movie Trailer];<br><br>*Id.* ¶¶ 30-31, 58; Ex. 52 [certificate of production]; |

| Uncontested Fact | Evidence |
|---|---|
| | Husain Amended Answer, ¶ 25(c) (admitted, Movie Trailer was sold in a reverse merger in September 2012). |

## V.   Certain of the Shell Companies' False and Misleading Periodic Reports

| Uncontested Fact | Evidence |
|---|---|
| 70.   Between 2008 and 2013, eight of the Shell Companies collectively filed with the SEC over thirty-five periodic reports on Forms 10-K and 10-Q. | Husain Amended Answer, ¶¶ 20-27. |
| 71.   From May 13, 2008 through November 12, 2009, New Image filed nine periodic reports with the SEC pursuant to Section 15(d) of the Exchange Act and related rules thereunder, including reports filed on Form 10-K and Form 10-Q. | Husain Amended Answer, ¶ 20(b). |
| 72.   From March 23, 2009 through November 16, 2009, PR Complete filed seven periodic reports with the SEC pursuant to Section 15(d) of the Exchange Act and related rules thereunder, including reports filed on Form 10-K and Form 10-Q. | Husain Amended Answer, ¶ 21(b). |
| 73.   From July 20, 2010 through January 10, 2011, Ciglarette filed three periodic reports with the SEC pursuant to Section 15(d) of the Exchange Act and related rules thereunder, including reports filed on Form 10-K and Form 10-Q. | Husain Amended Answer, ¶ 22(b). |
| 74.   From August 31, 2010 through May 16, 2011, Rapid Holdings filed three periodic reports with the SEC | Husain Amended Answer, ¶ 23(b). |

| Uncontested Fact | Evidence |
|---|---|
| pursuant to Section 15(d) of the Exchange Act and related rules thereunder, including reports filed on Form 10-K and Form 10-Q. | |
| 75.    From August 31, 2010 through May 16, 2011, Resume in Minutes filed four periodic reports with the SEC pursuant to Section 15(d) of the Exchange Act and related rules thereunder, including reports filed on Form 10-K and Form 10-Q. | Husain Amended Answer, ¶ 24(b). |
| 76.    From May, 9, 2011 through November 29, 2011, Movie Trailer filed three periodic reports with the SEC pursuant to Section 15(d) of the Exchange Act and related rules thereunder, including reports filed on Form 10-K and Form 10-Q. | Husain Amended Answer, ¶ 25(b). |
| 77.    From November 19, 2011 through June 28, 2012, Health Directory filed four periodic reports with the SEC pursuant to Section 15(d) of the Exchange Act and related rules thereunder. | Husain Amended Answer, ¶ 26(b). |
| 78.    From June 14, 2012 through September 23, 2013, Comp Services filed four periodic reports with the SEC pursuant to Section 15(d) of the Exchange Act and related rules thereunder. | Husain Amended Answer, ¶ 27(b). |
| 79.    Shell Companies "New Image, PR Complete, Ciglarette, Resume in Minutes, Rapid Holdings, Movie Trailer, Health Directory, and Comp Services filed annual and quarterly reports containing material | Husain Amended Answer, ¶ 216. |

| Uncontested Fact | Evidence |
|---|---|
| misrepresentations and omissions regarding, among other things, the sham companies' business purposes, Husain's identity and role as the control person and promoter of the companies, the Straw Shareholders' and puppet CEOs' true nature, and in two instances, the existence of merger plans." | |
| 80.     The Shell Companies' periodic reports listed the Puppet CEOs as the executive officers, and did not disclose that Husain in fact controlled the companies. | *E.g.,* Longo Decl. Ex. 10_[Health Directory 10-Q at 6 (signature of Humaira Haider as CEO and on Ex. 31.1 and 32.1, SOX 302 certifications; no reference to Husain's ownership or control)]; Ex. 11 [Testimony Ex. 288, Health Directory Form 10-K at 12-13, 15 (listing Humaira Haider as sole officer and director, and sole beneficial owner of more than 5% of the company's stock)]; *Id.* ¶¶ 11-12. |
| 81.     Husain "directed the preparation of the Shell Companies' periodic filings and reviewed and approved drafts of the periodic reports.  Jaclin's associates also emailed the draft periodic reports to Husain, once they were ready for review by the company and the outside auditor." | Husain Amended Answer, ¶ 92. |
| 82.     Husain "exercised control over the Shell Companies and kept his name off all SEC filings." | Husain Original Answer, ¶ 93(a). |
| 83.     The periodic filings made by certain of the Shell Companies on Forms 10-K and 10-Q were misleading in that they contained "no disclosure of | RFA Response Nos. 9-10; RFA Nos. 9-10; Husain Criminal Plea, ¶ 2. . |

| Uncontested Fact | Evidence |
|---|---|
| Husain's role as a controlling person" of the Shell Companies. | |
| 84.  The periodic filings made by certain of the Shell Companies on Forms 10-K and 10-Q additionally did not disclose how the Straw Shareholders were recruited. | RFA Response No. 12; RFA No. 12. |

## VI.  Additional Misleading Filings for Health Directory and Movie Trailer

| Uncontested Fact | Evidence |
|---|---|
| 85.  Health Directory was sold through a reverse merger on July 20, 2012 for $425,000 | Husain Amended Answer, ¶ 26(c). |
| 86.  Several weeks prior to the sale, on June 28, 2012, Jaclin's firm, as company counsel, filed Health Directory's Form 10-K report with the SEC. | Husain Amended Answer, ¶ 114. |
| 87.  Movie Trailer was sold through a reverse merger on September 11, 2012 for $370,000. | Husain Amended Answer, ¶ 25(c). |
| 88.  One week before the sale, on September 4, 2012, Jaclin's firm, as company counsel, filed Movie Trailer's post-effective amendment to its Form S-1 registration statement, which had been reviewed and approved by Husain. | Husain Amended Answer, ¶ 120. |
| 89.  "For [Health Directory and Movie Trailer], Jaclin, as company counsel, also filed a post-effective amendment to the registration statement or a Form 10-K shortly in advance of the sale." | Husain Amended Answer, ¶ 13. |

| Uncontested Fact | Evidence |
|---|---|
| 90.    Health Directory's Form 10-K and Movie Trailer's post-effective amendment stated that they had no merger plans. | Longo Decl. Ex. 11 [Testimony Ex. 288, Health Directory 10-K at 9 ("[W]e do not have any plan, arrangement or understanding to engage in a merger or acquisition with any other entity")]; <br><br> Ex. 8 [Testimony Ex. 147, Movie Trailer S-1A #4 at SEC_LA-4240_001638 ("[W]e do not have any plan, arrangement or understanding to engage in a merger or acquisition with any other entity")]; <br><br> *Id.* ¶¶ 9, 12. |
| 91.    Husain "directed, reviewed and approved these two filings, which falsely claimed that neither company had any plans or understandings to engage in a merger—even though portions of the sales proceeds had already been received into escrow at Jaclin's firm, Jaclin's firm had begun to prepare merger documents, and the due diligence process by the Shell Company Purchasers had begun." | Husain Amended Answer, ¶ 13. |

## VII.    The Sales of the Shell Companies

| Uncontested Fact | Evidence |
|---|---|
| 92.    "Approximately one-and-a-half to two years of their incorporation, Husain sold seven of the Shell Companies (*i.e.* New Image, PR Complete, Ciglarette, Rapid Holdings, Resume in Minutes, Health Directory, [and] Movie Trailer...." | Husain Original Answer, ¶¶ 96-97; <br><br> *see also* Husain Amended Answer, ¶¶ 96-97. |
| 93.    Husain's sales to the shell company purchasers, and their subsequent sales to the public markets, | Husain Amended Answer, ¶ 126. |

| Uncontested Fact | Evidence |
|---|---|
| were not "validly registered" with the SEC. | |
| 94. On December 7, 2009, New Image was sold, through a reverse merger, for $215,000. | Husain Amended Answer, ¶ 20(c). |
| 95. Post-merger public sales began in December 2009 following New Image's sale, in the new entity's stock, Car Charging Group, Inc., under the ticker "CCGI." | Longo Decl. ¶ 41; Ex. 36 [Price Volume Chart from Dow Jones Factiva for trading in CCGI/BLNK]. |
| 96. On December 4, 2009, PR Complete was sold, through a reverse merger, for $240,000. | Husain Amended Answer, ¶ 21(c). |
| 97. The purchasers of PR Complete included Renee Honig and Peter T. Benz. | Longo Decl. ¶¶ 67-71; Ex. 61 [SEC-SRFF-E-011051-54, Holladay Stock Transfer Shareholder Detail List]; Ex. 62 [Testimony Ex. 126, Anslow & Jaclin ledger for PR Complete sale]; Ex. 63 [SEC Investigative Testimony of Gregg Jaclin ("Jaclin") 59:20-62:3]; Ex. 64 [SEC-HST-E-0000014, Holladay Stock Transaction Journal]; Ex. 65 [SEC-HST-E-0000062, Holladay Stock Transfer Co. Declaration of Secretary Tom Laucks]. |
| 98. Post-merger public sales by PR Complete's purchasers began in January 2010 following PR Complete's sale, in the new entity's stock, YesDTC Holdings, under the ticker "YESD." | Longo Decl. ¶¶ 32-37, 42; Ex. 32 [YESD Trading summary from January 21, 2010 to March 31, 201]; Ex. 37 [Price Volume Chart from Bloomberg for trading in YESD]. |
| 99. Husain directed a trade in YesDTC's stock in March 2010 on behalf of his entity, Ucino. | Longo Decl. Ex. 31 [SEC-FBI-E-004238-40, 3/24/10 Emails between Husain and Carlos Smith of Montaque Group re: Trade]; |

| Uncontested Fact | Evidence |
|---|---|
| | *Id.* ¶¶ 32, 73. |
| 100.   On March 1, 2011, Ciglarette was sold, through a reverse merger, for $275,000. | Husain Amended Answer, ¶ 22(c). |
| 101.   The purchasers of Ciglarette included Lee Bear and Far East Strategies. | Longo Decl. ¶¶ 60, 72;<br><br>Ex. 54 [Testimony Ex. 313, 3/3/11 Letter from Anslow & Jaclin to Holladay Stock Transfer re: transfer of shares];<br><br>Ex. 66 [Jaclin 59:20-62:3]. |
| 102.   Post-merger public sales by Ciglarette's purchasers began in March 2011 following Ciglarette's sale, in the new entity's stock, Kirin International Holding, under the ticker "KIRI." | Longo Decl. ¶¶ 33-36, 38, 43;_<br><br>Ex. 33 [KIRI Trading summary from March 30, 2011 to May 27, 2011];<br>Ex. 38 [Price Volume Chart from Dow Jones Factiva for trading in KIRI]. |
| 103.   On May 11, 2011, Rapid Holdings was sold, through a reverse merger, for $367,000. | Husain Amended Answer, ¶ 23(c). |
| 104.   Post-merger public sales occurred beginning in July 2011 following Rapid Holdings' sale, in the new entity's stock, Izea, Inc., under the ticker "IZEA." | Longo Decl. ¶ 44;_<br><br>Ex. 39 [Price Volume Chart from Dow Jones Factiva for trading in IZEA]. |
| 105.   On June 24, 2011, Resume in Minutes was sold through a reverse merger, for $350,000. | Husain Amended Answer, ¶ 24(c). |
| 106.   Post-merger public sales began in July 2011 following Resume in Minutes' sale, in the new entity's stock, MEDL Mobile Holdings, Inc., under the ticker "MEDL." | Longo Decl. ¶ 45;<br><br>Ex. 40 [Price Volume Chart from Bloomberg for trading in MEDL]. |

| Uncontested Fact | Evidence |
|---|---|
| 107.   On September 11, 2012, Movie Trailer was sold through a reverse merger, for $370,000. | Husain Amended Answer, ¶ 25(c). |
| 108.   The purchasers of Movie Trailer included Rowland Day. | Longo Decl. ¶¶ 63-66; Ex. 58 [Testimony Ex. 92, 7/22/12 Emails between Husain and Day re: MOTG]; Ex. 59   [Testimony Ex. 93, 8/9/12 Emails between Husain and Rowland Day re: Movie]; Ex. 60 [Testimony Ex. 104, 9/3/12 Emails among Husain, Day, Jaclin *et al.* re: Movie Trailer Galaxy MOTG]; Exs. 56-57 [5/22/14 & 6/4/14 SEC Investigative Testimony of Rowland Day ("Day") 47:18-50:1, 50:15-52:15, 105:7-106:25, 129:3-130:10]. |
| 109.   Post-merger public sales by Movie Trailer's purchaser began in October 2012, following Movie Trailer's sale, in the new entity's stock, Broadcast Live Digital Corp., under the ticker "BFLD." | Longo Decl. ¶¶ 33-36, 40, 47; Ex. 35 [BFLD Trading summary from October 15, 2012 to November 28, 2012]. Ex. 42 [Price Volume Chart from Dow Jones Factiva for trading in BFLD]. |
| 110.   On July 20, 2012, Health Directory was sold through a reverse merger, for $425,000. | Husain Amended Answer, ¶ 26(c). |
| 111.   The purchasers of Health Directory included Rowland Day. | Longo Decl. ¶¶ 39, 61-62; Ex. 34 [SOLS Trading Summary from January 22, 2013 to March 4, 2013]; Ex. 55 [Testimony Ex. 89, 7/3/12 Emails between Day and Jaclin re: purchase of Health Directory]; Ex. 56 [Day 19:19-27:4]. |
| 112.   Post-October 15, 2012 to November 28, 2012 merger public | Longo Decl. ¶¶ 33-36, 39, 46, 61-62; Ex. 34 [SOLS Trading Summary from |

| Uncontested Fact | Evidence |
|---|---|
| sales by Health Directory's purchaser began in October 2012 following Health Directory's sale, in the new entity's stock, Sollensys Corp., under the ticker "SOLS." | January 22, 2013 to March 4, 2013]; Ex. 41 [Price Volume Chart from Dow Jones Factiva for trading in SOLS]. |
| 113. "The offers and sales by Husain of [PR Complete, Ciglarette, Rapid Holdings, Resume in Minutes, Health Director, and Movie Trailer] to the Shell Company Purchasers were never registered with the SEC. | Husain Original Answer, ¶ 127. |
| 114. The Shell Company purchasers' public sales of the stock of Ciglarette, PR Complete, Health Directory, and Movie Trailer were never registered with the SEC. | Husain Amended Answer, ¶¶ 126, 186. |
| 115. Jaclin introduced Husain to the purchasers for New Image, Ciglarette, PR Complete, Rapid Holdings, Resume in Minutes, and Movie Trailer. | Husain Amended Answer, ¶ 99. |
| 116. "For each shell company sale, Jaclin advised Husain to appoint a shareholder representative to effect the sale, including the transfer of the Straw Shareholders' stock to the purchaser(s)." | Husain Amended Answer, ¶ 100. |
| 117. "Husain appointed a shareholder nominee as a representative for the Straw Shareholders for each shell company sale." | Husain Amended Answer, ¶ 101. |
| 118. "For each sale, Jaclin's firm, as company counsel, prepared stock purchase agreements among the Shell Company Purchaser(s), the shell company, the puppet CEO, and each | Husain Amended Answer, ¶ 102. |

| Uncontested Fact | Evidence |
|---|---|
| Straw Shareholder (on whose behalf the nominee-representative signed the agreement)." | |
| 119.  "Also as part of each sale, Jaclin's firm prepared an escrow agreement among the nominee-representative, the Shell Company Purchaser(s), and an escrow agent." | Husain Amended Answer, ¶ 103. |
| 120.  "For six of the sales, Jaclin's firm additionally served as the escrow agent to effect the transfer of the stock certificates and the funds for the shell company purchase." | Husain Amended Answer, ¶ 104. |
| 121.  "Once the escrow agent received all of the funds for the sale, the signed agreements, the stock certificates, and the stock powers, the escrow agent wired the sales proceeds to the nominee-representative's bank account, less any amounts owed for Jaclin's firm's legal fees." | Husain Amended Answer, ¶ 105. |
| 122.  "As a further part of each shell company sale, Jaclin's firm provided opinion letters instructing the transfer agent to cancel the shares in the name of the Straw Shareholders and to reissue them in the names of the Shell Company Purchasers." | Husain Amended Answer, ¶ 107. |
| 123.  "The sales were accomplished through "reverse merger" transactions with private purchasing entities, where the shareholders of the purchaser acquired a majority of the shares of the public shell company (*i.e.*, the Straw Shareholders' shares), and then the | Husain Amended Answer, ¶ 108. |

| Uncontested Fact | Evidence |
|---|---|
| public shell company was merged into the purchasing entity." | |
| 124.   The shell corporations Husain formed were sold to people Husain "knew would likely use the shell corporation to merge into private corporations that had some ongoing business, in a process known as a 'reverse merger.'" | Husain Criminal Plea, ¶ 2. |
| 125.   Husain understood that a "reverse merger" is a "legal mechanism for private companies to become public companies.' | Husain Criminal Plea, ¶ 2. |
| 126.   Husain was "aware that the shell companies that [he] was creating were valuable because they allowed the people who acquired them to completely control the shares and corporate actions of the companies that otherwise appeared to be legitimate public companies." | Husain Criminal Plea, ¶ 2. |
| 127.   Husain knew that the Shell Companies were sold to people who would "likely use the shell corporation to merge into private corporations that had some ongoing business." | Husain Original Answer, ¶ 74(b). |
| 128.   "After the sale of each shell company, the shell company's puppet CEO resigned and new management was installed." | Husain Amended Answer, ¶ 110. |
| 129.   "New management changed the shell company's name and business model, as announced in Form 8-K reports publicly filed with the SEC." | Husain Amended Answer, ¶ 111. |

| Uncontested Fact | Evidence |
|---|---|
| 130.   The sales prices of Ciglarette ($275,000), Resume in Minutes ($350,000), Rapid Holdings ($367,000), Health Directory ($425,000), and Movie Trailer ($370,000) totaled $1,787,000. | Husain Amended Answer, ¶¶ 22(c), 24(c), 23(c), 26(c), 25(c). |
| 131.   The sales of five of the companies yielded proceeds of at least $1.6 million. | Husain Amended Answer, ¶¶ 12, 97. |
| 132.   Anslow and Jaclin sent proceeds from the sales of Ciglarette, Resume in Minutes, Rapid Holdings, Health Directory, and Movie Trailer to the offshore accounts of two entities, Liric and Ucino. | *E.g.,* Longo Decl. Exs. 12-21, 55-56 [Wire transfer records from Anslow & Jaclin account at Wells Fargo Bank to Liric and Ucino accounts at Banque de Gestion Edmond de Rothschild – Monaco for sale of: Ciglarette (Exs. 12, 17); Resume in Minutes (Ex. 16); Rapid Holdings (Ex. 15); Health Directory (Exs. 13, 19); and Movie Trailer (Exs. 14, 18); Wire transfer records from Anslow & Jaclin account at Wells Fargo Bank to Health Directory account at Bank of America (Ex. 13, 19); Wire transfer records from Anslow & Jaclin account at Wells Fargo Bank to Movie Trailer account at Bank of America (Ex. 50); Wire transfer records from Anslow & Jaclin Account at Wells Fargo Bank to William Joubert (finder for Health Directory and Movie Trailer sales) account at JP Morgan Chase Bank (Exs. 13, 19, 49); Anslow & Jaclin Ledger of Resume in Minutes (Ex. 21); Ledger of Rapid Holdings (Ex. 20)]; *Id.* ¶¶ 59, 69; Ex. 53 [certificate of production]; Ex. 63 [SEC Investigative Testimony of Gregg Jaclin ("Jaclin") 59:20-62:3]. |
| 133.   During the relevant period, Husain controlled Ucino and Liric. | Longo Decl. Ex. 22   [SEC-FBI-E-0004910-12, 12/16/09 Emails between Husain and Rothschild Bank discussing his association with Ucino]; Ex. 23   [SEC-FBI-E-002127, 10/26/11 Emails between Husain and |

| Uncontested Fact | Evidence |
|---|---|
| | representatives of Rothschild Bank, discussing that he is sole signatory for Ucino]; <br><br> Ex. 24   [SEC-FBI-E-0004962-66, 8/16/12 Emails between Husain and representatives of Rothschild Bank, discussing the opening of Liric account and closing of Ucino's]; <br><br> Ex. 51  [SEC-FBI-E-0004589-92, 1/10/11 Emails between Husain and Natalie Thommen of TMF Group and E. Sumner of the Montaque Group where Husain agrees to provide corporate information for Ucino]; <br><br> *Id.* ¶¶ 23-25, 57, 73; <br><br> Husain Amended Answer, ¶ 62 (admitted that Husain "exercised influence over the entities controlling the shares of the stock of the shell companies"). |
| 134.   Following the merger for PR Complete, "PR Complete changed its name to YesDTC Holdings.  Common stock of YesDTC Holdings was offered and sold to the public beginning on January 21, 2010, under the symbol "YESD."   On November 17, 2014, the SEC suspended trading in YESD pursuant to Section 12(k) of the Exchange Act.  *In re YesDTC Holdings, Inc*., Release No. 34-73611 (Nov. 17, 2014).  On December 15, 2014, each class of its registered securities was revoked pursuant to Section 12(j) of the Exchange Act, which became final on January 27, 2015.  In re YesDTC Holdings, Inc., Rel. No. 34-74140 (Jan. 27, 2015).  On February 25, 2015, a final judgment was entered as to YesDTC's CEO Joseph Noel, for a pump and dump | Husain Amended Answer, ¶¶ 21(d)-(e). |

| Uncontested Fact | Evidence |
|---|---|
| scheme involving YesDTC's stock. *SEC v. Noel*, Case No. 14-cv-05054-VC (N.D. Cal.) (Dkt. No. 27)." | |
| 135.   Following the Movie Trailer merger, it "changed its name to Broadcast Live Digital Corp.  Common stock of Broadcast Live Digital Corp. was offered and sold to the public beginning on October 23, 2012 under the symbol "BFLD."  Its common stock was quoted on OTC Link.  On March 7, 2014, the SEC suspended trading in the securities of Broadcast Live Digital Corp., citing questions regarding the accuracy of publicly available information concerning its business operations. *In re Broadcast Live Digital Corp.*, Rel. No. 34-71659 (Mar. 7, 2014)." | Husain Amended Answer, ¶ 25(d). |

VIII.   **Husain's Obstruction of Justice and Other Actions to Conceal His Fraudulent Conduct**

| Uncontested Fact | Evidence |
|---|---|
| 136.   Husain and Jaclin "made concerted efforts to conceal their fraudulent scheme, including: (1) communicating through email accounts Husain set up, at Jaclin's direction, that falsely appeared to be email accounts in the names of the puppet CEOs, rather than email accounts created and used by Husain; (2) using a computer consultant, hired by Husain at Jaclin's direction, to destroy emails between Husain and Jaclin or Jaclin's firm; and (3) collaborating to coach one of the | Husain Amended Answer, ¶ 14. |

| Uncontested Fact | Evidence |
|---|---|
| puppet CEOs how to testify falsely in SEC investigative proceedings, to hide Husain's identity and role as the shell company's control person." | |
| 137.  "In or about 2011, Jaclin advised Husain that, to avoid regulatory scrutiny, they should exchange fewer emails." | Husain Amended Answer, ¶ 143. |
| 138.  "Jaclin suggested that Husain create and use email accounts in the names of the puppet CEOs to communicate with Jaclin and his firm." | Husain Amended Answer, ¶ 144. |
| 139.  "Husain then created email accounts in the names of the puppet CEOs of Health Directory, Movie Trailer, Comp Services, and Counseling International, and used these email addresses to communicate with Jaclin and his firm." | Husain Amended Answer, ¶ 145 |
| 140.  "In 2012, Jaclin asked Husain, and Husain agreed, to hire a computer consultant to 'scrub' emails amongst Husain, Jaclin and Jaclin's firm." | Husain Amended Answer, ¶ 146. |
| 141.  "In August 2012, the puppet CEO of PR Complete told Husain that she had been subpoenaed by the SEC, in investigative proceedings regarding PR Complete/YesDTC." | Husain Amended Answer, ¶ 148. |
| 142.  "Husain contacted Jaclin regarding the subpoena to the puppet CEO." | Husain Amended Answer, ¶ 149. |
| 143.  "Jaclin referred Husain to an attorney, whom Husain arranged to have represent the puppet CEO for purposes of her testimony." | Husain Amended Answer, ¶ 150. |

| Uncontested Fact | Evidence |
|---|---|
| 144.  "Before her SEC testimony, in August and September 2012, by telephone and in person, Husain coached the puppet CEO (Chrissy Albice) on how to testify, and 'instructed her to testify falsely by leaving [his] name out of it.'" | Husain Amended Answer, ¶ 151; *see also* Husain Criminal Plea, ¶ 2. |
| 145.  Husain told Albice to withhold facts about his involvement from the SEC because he "did not want the SEC to know about [his] involvement with PR Complete" and in order for her testimony to be "consistent with what was falsely disclosed in [PR Complete's] registration statements." | Husain Criminal Plea, ¶ 2; Husain Amended Answer, ¶ 152. |
| 146.  "Prior to the puppet CEO's testimony, Jaclin suggested to Husain that her testimony should be consistent with what was falsely disclosed in the registration statements Jaclin's firm had filed on behalf of PR Complete." | Husain Amended Answer, ¶ 153. |
| 147.  Husain got advice from Jaclin on "how best to 'coach'" Albice and agreed that the "less Albice said about [Husain's] involvement, the better." | Husain Criminal Plea, ¶ 2; Husain Amended Answer, ¶¶ 154-155. |
| 148.  Husain agreed with Albice and Jaclin to obstruct the proceedings of the SEC by concealing the facts surrounding his true involvement in PR Complete. | Husain Criminal Plea, ¶ 2; Husain Amended Answer, ¶ 156. |
| 149.  Husain pled guilty to one count of conspiracy to obstruct the proceedings of the SEC, with co-conspirator Jaclin. | Husain Amended Answer, ¶¶ 5, 17; Husain Criminal Plea, ¶ 1. |

## IX.    Violations That are Admitted By Husain

| Uncontested Fact | Evidence |
|---|---|
| 150.   By his conduct, Husain has "violated, and unless restrained and enjoined will continue to violate" Sections 5(a) and 5(c). | Husain Amended Answer, ¶ 180. |
| 151.   By his conduct, Husain has "aided and abetted, and unless enjoined, [is] reasonably likely to continue to aid and abet, violations of" Sections 5(a) and 5(c). | Husain Amended Answer, ¶ 186. |
| 152.   "[T]he offers and sales of stock in New Image, PR Complete, Ciglarette, Rapid Holdings, Resume in Minutes, Health Directory and Movie Trailer to Shell Company Purchasers were not registered with the SEC.  No valid registration statement was filed or in effect for those sales, and no exemption from registration applied. Husain, as the issuer of these shares, thus violated Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c), by offering and selling securities to the public in those unregistered transactions, for which no registration statement was on file or in effect." | Husain Amended Answer, ¶ 182. |
| 153.   New Image, PR Complete, Ciglarette, Resume in Minutes, Rapid Holdings, Movie Trailer, Health Directory, and Comp Services filed periodic reports under Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d) that violated Section 15(d) and Rules 12b-20, 15d-1, 15d-13 of the Exchange Act,  15  U.S.C. § 78o(d) and 17 | Husain Amended Answer, ¶¶ 216-217. |

| Uncontested Fact | Evidence |
|---|---|
| C.F.R. §§ 240.12b-20, 240.15d-1, and 240.15d-13, "containing material misrepresentations and omissions regarding, among other things, the sham companies' business purposes, Husain's identity and role as the control person and promoter of the companies, the Straw Shareholders' and puppet CEOs' true nature, and, in two instances, the existence of merger plans." | |
| 154.   "Pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), as the person who, directly or indirectly, controlled the shell companies, Husain is liable jointly and severally with and to the same extent as the shell companies for [their] violations of the Exchange Act and rules and regulations thereunder committed by the shell companies." | Husain Amended Answer, ¶ 222. |
| 155.   Husain "did not act in good faith, and directly or indirectly induced the act or acts" that constituted violations of the Exchange Act and the rules and regulations thereunder committed by the Shell Companies. | Husain Amended Answer, ¶ 222. |

## **CONCLUSIONS OF LAW**

1.     Summary adjudication "upon all or any part of [a] claim" is appropriate where there is no genuine dispute as to any material fact regarding that portion of the claim.  FRCP 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

2.     The movant in a summary judgment motion bears the initial burden of identifying the evidence that demonstrates the absence of any material fact.  *See Celotex*, 477 U.S. at 323.

3.     Once the summary judgment movant has meet its burden, the non-moving party may not rest on conclusory allegations or bald assertions, *see Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989), but must come forward with significant probative evidence tending to support its claim that material, triable issue of fact remain.  *See Anderson v. Libby Lobby, Inc.*, 477 U.S. 242, 249-50 (1986); *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).

4.     The evidence set forth by the non-moving party must be sufficient, taking the record as a whole, to allow a rational jury to find for the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Consequently, "[t]he mere scintilla of evidence in support of the [nonmoving party's] position will be insufficient."  *Liberty Lobby*, 477 U.S. at 252.

5.     Section 17(a)(1) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), prohibits any person, in the offer or sale of any securities, from employing any device, scheme, or artifice to defraud.

6.     Section 17(a)(2) of the Securities Act prohibits any person, in the offer or sale of securities, from obtaining money or property by means of a materially misleading statement or omission.

7.      Section 17(a)(3) of the Securities Act prohibits any person, in the offer or sale of any securities, from engaging in any transaction, practice, or course of business which operates, or would operate, as a fraud or deceit upon the purchaser.

8.     Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"),

and Rule 10b-5(a) and (c) thereunder make it unlawful for any person in connection with the purchase or sale of securities to employ any device, scheme or artifice to defraud, or to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.  15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5.

9.      Section 5(a) and (c) of the Securities Act prohibit the unregistered offer or sale of securities, in interstate commerce.  15 U.S.C. § 77e(a), (c).

10.    Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d), requires the filing by issuers of annual and quarterly reports in conformity with the SEC's rules and regulations.  Exchange Act Rule 15d-1, 17 C.F.R. § 240.15d-1, requires the filing of accurate annual reports; Rule 15d-13, 17 C.F.R. § 240. 15d-13, requires the filing of accurate quarterly reports; and Rule 12b-20, 17 C.F.R. § 240.12b-20, requires an issuer to include in its annual and quarterly reports material information as may be necessary to make the required statements, in light of the circumstances in which they were made, not misleading.

11.    To prove a claim based on aiding and abetting liability, the SEC must show: (1) the existence of an independent primary violation; (2) actual knowledge or reckless disregard by the alleged aider and abettor of the wrong and of his/her role in furthering it; and (3) that the aider and abettor substantially assisted in the accomplishment of the primary violation.  *SEC v. Fehn*, 97 F.3d 1276, 1288 (9th Cir. 1996).

12.    Under Section 20(a) of the Exchange Act, a person may be held liable for another person's violation of the Exchange Act as a "control person."  15 U.S.C. § 78t(a).

13.    Control person liability requires:  (1) a violation of the Exchange Act, and (2) that the control person directly or indirectly controlled the primary violator. *SEC v. Todd*, 642 F.3d 1207, 1223-1224 (9th Cir. 2011).

14.    Rules 10b-5(a) and (c), and found that these provisions "capture a wide

34

range of conduct." *Lorenzo v. SEC*, 587 U.S. ___, 139 S. Ct. 1094, 1101 (2019). A "device" is simply "'[t]hat which is devised, or formed by design,'"; a "'scheme'" is a "'project,'" "'plan[,] or program of something to be done,'" and an "'artifice'" is "an artful stratagem or trick,'" *id*. (*quoting Aaron v. SEC*, 446 U.S. 680, 696, n. 13 (1980)).

15.     The Ninth Circuit has adopted the "principal purpose and effect" test to determine whether an individual is primarily liable for scheme liability under the federal securities laws. *See Middlesex Retirement Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1191 (C.D. Cal. 2007); *see also SEC v. Fraser*, 2009 WL 2450508 at *10 (D. Ariz. Aug. 11, 2009) (unreported decision) (quoting *Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1048 (9th Cir. 2006), *vacated on other grounds*, 519 F.3d 1041 (9th Cir. 2008)). An individual may be liable for a scheme to defraud if he or she "committed a manipulative or deceptive act in furtherance of a scheme." *Simpson,* 452 F.3d at 1048 (quoting *Cooper v. Pickett,* 137 F.3d 616 (9th Cir. 1997). A deceptive act is one that "create[s] the false appearance of fact." *Id.*

16.     Violations of Section 17(a)(1) of the Securities Act and Section 10(b) of the Exchange Act/Rule 10b-5 require scienter, while violations of Section 17(a)(2)-(3) of the Securities Act require only a showing of negligence. *Aaron v. SEC*, 446 U.S. 680, 701-02 (1980); *SEC v. Phan*, 500 F.3d 895, 907-08 (9th Cir. 2007); *SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 856 (9th Cir. 2001).

17.     In the Ninth Circuit, scienter may be established by a showing of recklessness, defined as "highly unreasonable" conduct "involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it…. [T]he danger of misleading buyers must be actually known or so obvious that any reasonable man would be legally bound as knowing." *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569-70 (9th Cir. 1990) (en banc).

18.     The Ninth Circuit further clarified the "recklessness" standard in *SEC v. Platforms Wireless Int'l Corp.* where it held that scienter requires either "deliberate recklessness" or "conscious recklessness" – a "form of intent rather than a greater degree of negligence."  617 F.3d 1072, 1093 (9th Cir. 2010).  Recklessness may be inferred from circumstantial evidence.  *Herman & MacLean v. Huddleston*, 459 U.S. 390, 391 n. 30 (1983); *SEC v. Burns*, 816 F.2d 471, 474 (9th Cir. 1987).

19.     Negligence is the absence of "reasonable prudence."  *Dain Rauscher, Inc.*, 254 F.3d at 856-57; *SEC v. Hughes Capital Corp*., 124 F.3d 449, 453-54 (3d Cir.1997) (defining negligence in the securities context as the failure to exercise reasonable care or competence).

20.     Information is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988); *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976); *SEC v. Platforms Wireless*, 617 F.2d at 1092. Liability arises not only from affirmative representations but also from failures to disclose material information.  *SEC v. Dain Rauscher*, 254 F.3d at 855-56.

21.     The phrase "in the offer or sale" of securities under Section 17(a) is "broad enough to cover the entire selling process."  *United States v. Naftalin*, 441 U.S. 768, 777-78 (1979) ("[t]he statutory language does not require that the victim of the fraud be an investor—only that the fraud occur 'in' an offer or sale" … Securities Act was intended "to achieve a high standard of business ethics . . . in every facet of the securities industry").

22.     The "in connection with" a purchase or sale requirement of Section 10(b) is subject to an expansive view, met when the alleged misstatements or deceptive conduct "coincide[] with a securities transaction."  *Merrill Lynch, Pierce, Fenner & Smith Inc., v. Dabit*, 547 U.S. 71, 85 (2006); *SEC v. Zandford*, 535 U.S. 813, 822 (2002).  A fraud is "in connection with" the purchase or sale of securities if it "'somehow touches upon' or has 'some nexus' with 'any securities transaction'" in

interstate commerce.  *SEC v. Rana Research, Inc.*, 8 F.3d at 1362 (citations omitted).

23.    Email and the internet are instrumentalities of interstate commerce.  See, e.g., *United States v. Nader*, 542 F.3d 713, 717 (9th Cir. 2008) ("Telephones are instrumentalities of interstate commerce ..."); *Utah Lighthouse Ministry v. Foundation for Apologetic Info. & Research*, 527 F.3d 1045, 1054 (10th Cir. 2008) ("We agree that the Internet is generally an instrumentality of interstate commerce.").

24.    Sections 5(a) and (c) of the Securities Act, 15 U.S.C. §§ 77e(a) & 77e(c), prohibit the unregistered offer or sale of securities in interstate commerce unless an exemption from registration applies.  *SEC v. Phan*, 500 F.3d 895, 901-02 (9th Cir. 2007); *SEC v. Murphy*, 626 F.2d 633, 640 (9th Cir. 1980).  Section 5 operates as a strict liability statute.  *Id.*

25.    A registration statement "permits an issuer, or other person, to make only the offers and sales described in the registration statement."  *SEC v. Cavanagh*, 155 F.3d at 129, 133; Section 6(a) of the Securities Act [15 U.S.C. § 77f(a)] (registration statement effective only as to the securities specified "as proposed to be offered"); *see SEC v. Phan*, 500 F.3d 895, 905 (9th Cir. 2007) (citing Section 6(a) to find that a registration statement did not cover certain offers and sales).

26.    Section 5 holds a defendant liable for either "directly or indirectly" offering and selling unregistered securities, 15 U.S.C. §§ 77e(a), (c), a person can be held primarily liable for actively participating in the unregistered offer or sale.  *SEC v. Murphy*, 626 F.2d 633, 649 (9th Cir. 1980).  The "defendant's conduct [must] be both necessary to, and a substantial factor in, the unlawful transaction."  *SEC v. Rogers*, 790 F.2d 1450, 1456 (9th Cir. 1986); *SEC v. Holschuh*, 694 F.2d 130, 139-140 (7th Cir. 1982) (citing *Murphy*, 626 F.2d at 650-652).

27.    Section 20(b) of the Securities Act, and Section 21(d) of the Exchange Act, provide that upon proper showing, a permanent injunction shall be granted in enforcement actions brought by the SEC.  15 U.S.C. §§ 77t(b) and 78u(d),

28.    That burden is met when the evidence establishes a reasonable

likelihood of a future violation of the securities laws. *SEC v. Murphy*, 626 F.2d at 633; *SEC v. Koracorp Indus., Inc.*, 575 F.2d 692 (9th Cir. 1978); *SEC v. Fehn*, 97 F.3d 1276, 1295-96 (9th Cir. 1996).

29.     Factors to be considered in determining a reasonable likelihood of a future violation of the federal securities laws include the degree of scienter involved; the isolated or recurrent nature of the infractions; the defendant's recognition of the wrongful nature of his conduct; the likelihood that, based on the defendant's occupation, future violations might occur; and the sincerity of the defendant's assurances against future violations. *SEC v. Murphy*, 626 F.2d at 633; *SEC v. Koracorp Indus., Inc.*, 575 F.2d 692 (9th Cir. 1978); *SEC v. Fehn*, 97 F.3d 1276, 1295-96 (9th Cir. 1996).

30.     The SEC may seek, and courts may order, disgorgement of ill-gotten gains. *See SEC v. First Pac. Bancorp*, 142 F.3d 1186, 1191 (9th Cir. 1998); *SEC v. Patel*, 61 F.3d 137, 139 (2d Cir. 1995).

31.     Courts have "broad equity powers to order the disgorgement of 'ill-gotten gains' obtained through the violation of the securities laws." *SEC v. First Pac. Bancorp*, 142 F.3d at 1191; *see also SEC v. JT Wallenbrock & Assocs.*, 440 F.3d 1109, 1113 (9th Cir. 2006).

32.     The amount of disgorgement should include all gains flowing from the illegal activities. *See SEC v. JT Wallenbrock*, 440 F.3d at 1114; *SEC v. Cross Fin. Servs, Inc.*, 908 F. Supp. 718, 734 (C.D. Cal. 1995).

33.     In calculating disgorgement, the SEC need only show "'a reasonable approximation of profits causally connected to the violation.'" *SEC v. First Pac. Bancorp*, 142 F.3d at 1192 n.6 (quoting *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996)); *SEC v. Patel*, 61 F.3d at 139.

34.     Disgorgement usually includes prejudgment interest. Courts order prejudgment interest to ensure that the wrongdoer does not profit from the illegal activity. *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1105 (2d Cir. 1972);

*SEC v. CMKM Diamonds, Inc.*, 635 F. Supp. 2d 1185, 1190 (D. Nev. 2006).

35. The Court has broad equity powers to order the disgorgement of ill-gotten gains obtained through a defendant's violation of the securities laws. Disgorgement is designed to deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making violations unprofitable. *SEC v. Platforms Wireless*, 617 F.3d 1072, 1096 (9th Cir. 2010); *SEC v. J.T. Wallenbrock & Assocs.*, 440 F.3d 1109, 1113 (9th Cir. 2006); *SEC v. First Pacific Bancorp*, 142 F.3d 1186, 1191 (9th Cir. 1998); *SEC v. Rind*, 991 F.2d 1486, 1493 (9th Cir. 1993) (disgorgement is an appropriate equitable remedy for violations of the securities laws); *SEC v. Olins*, 762 F. Supp. 2d 1193, 1197 (N.D. Cal. 2011).

10. To prove an appropriate disgorgement amount, the SEC need only show a "reasonable approximation" of profits causally connected to the violation. *Platforms Wireless*, 617 F.3d at 1096; *J.T. Wallenbrock*, 440 F.3d at 1113-14. Once the SEC has made such a showing, the burden then shifts to the defendant to "demonstrate that the disgorgement figure was not a reasonable approximation." *Platforms Wireless*, 617 F.3d at 1096 (*quoting SEC v. First City Financial Corp., Ltd.*, 890 F.2d 1215, 1232 (D.C. Cir. 1989)).

36. Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act provide that the SEC may seek monetary civil penalties for violations of those Acts. 15 U.S.C. §§ 77t(d), § 78u(d)(3).

37. The Securities Act and the Exchange Act provide that penalties be assessed according to a three-tier system. 15 U.S.C. §§ 77t(d), § 78u(d)(3); *SEC v. CMKM Diamonds*, 635 F. Supp. 2d at 1191.

38. The three tiers of penalty amounts under Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act correspond to specified degrees of culpability. 15 U.S.C. §§ 77t(d) & 78u(d)(3).

39. In assessing an appropriate civil penalty, courts frequently consider the factors used for determining the appropriateness of injunctive relief, discussed above

and as set forth in *SEC v. Murphy*, 626 F.2d 633 (9th Cir. 1980).  *See, e.g., SEC v. Abacus International Holding Corp.*, 2001 WL 940913, *5 (N.D. Cal. Aug. 16, 2001); *SEC v. Gowrish*, 2011 WL 2790482, *9 (N.D. Cal. Jul. 14, 2011); *SEC v. CMKM Diamonds, Inc.*, 635 F. Supp. 2d 1185, 1192 (D. Nev. 2009).

40.     Under Sections 20(e) and (g) of the Securities Act, 15 U.S.C. § 77t(e), (g), and Sections 2l(d)(2) and 21(d)(6) of the Exchange Act, 15 U.S.C. § 78u(d)(2), (6), a district court "may prohibit, conditionally or unconditionally, and permanently or for such period of time as it shall determine," any person who has engaged in securities fraud "from acting as an officer or director [ of a public company] if the person's conduct demonstrates unfitness to serve as an officer or director."

41.     In deciding whether to impose an officer and director bar, courts consider six factors: (1) the egregiousness of the conduct; (2) the defendant's "repeat offender" status; (3) the defendant's role or position when he or she engaged in the conduct; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur.  *SEC v. First Pacific Bancorp*, 142 F.3d 1186 (9th Cir.1998).

42.     Under Section 20(g) of the Securities Act, 15 U.S.C. § 77t(g), and Section 21(d)(6) of the Exchange Act, 15 U.S.C. § 78u(d)(6), a district court may prohibit any person who has engaged in securities fraud from participating in an offering of penny stock.   "When deciding to impose such a bar, the court looks at essentially the same factors that govern the imposition of an officer or director bar." *Steadman v. SEC*, 603 F.2d 1126, 1140 (5th Cir.1979).  The factors are: (1) the egregiousness of the underlying securities violation; (2) the defendant's "repeat offender" status; (3) the defendant's role or provision when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the

//

//

//

1    violation; and (6) the likelihood that misconduct will recur.  *First Pac. Bancorp*, 142

2    F.3d at 1193.

3

4    Dated:  May 11, 2020                    Respectfully submitted,

5

6                                             */s/ Amy Jane Longo*
                                            _____
7                                            Amy Jane Longo
                                            Roberto A. Tercero
8                                            Attorneys for Plaintiff
                                            Securities and Exchange Commission

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **PROOF OF SERVICE**

I am over the age of 18 years and not a party to this action.  My business address is:

U.S. SECURITIES AND EXCHANGE COMMISSION,
444 S. Flower Street, Suite 900, Los Angeles, California 90071
Telephone No. (323) 965-3998; Facsimile No. (213) 443-1904.

On May 11, 2020, I caused to be served the document entitled **STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT IMRAN HUSAIN** on all the parties to this action addressed as stated on the attached service list:

☐ **OFFICE MAIL:**  By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices.  I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

☐ **PERSONAL DEPOSIT IN MAIL:**  By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service. Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

☐ **EXPRESS U.S. MAIL:**  Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

☐ **HAND DELIVERY:**  I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

☐ **UNITED PARCEL SERVICE:**  By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Los Angeles, California.

☐ **ELECTRONIC MAIL:**  By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

☒ **E-FILING:**  By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

☐ **FAX:**  By transmitting the document by facsimile transmission.  The transmission was reported as complete and without error.

I declare under penalty of perjury that the foregoing is true and correct.

Date: May 11, 2020                    */s/ Amy Jane Longo*
                                      AMY JANE LONGO

1

**SEC v. IMRAN HUSAIN and GREGG EVAN JACLIN**
**United States District Court—Central District of California**
**Case No. 2:16-cv-03250-ODW (Ex)**

## SERVICE LIST

George B. Newhouse, Jr., Esq.
RICHARDS CARRINGTON, LLC
545 S. Figueroa Street, Seventh Floor
LA, CA 90012
T/**213-798-6387**
F/**303-962-2691**
george@richardscarrington.com
*Attorney for Defendant Imran Husain*